**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TRUDY BLOUGH,<br><br>        Plaintiff,<br><br>    v.<br><br>BCD TRAVEL USA LLC.<br><br>        Defendant. | Civil Action No. 2:23-cv-01979-MPK<br><br>Hon. Maureen P. Kelly<br><br><br>*Electronically Filed* |

<u>**DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Defendant BCD Travel USA LLC ("BCD"), pursuant to Rule 56 of the Federal Rules of

Civil Procedure and Local Rule 56.B.1, files this Concise Statement of Material Facts in support

of its Motion for Summary Judgment.

**I.      BCD'S BUSINESS**

1.      BCD is a global corporate travel management company primarily servicing

corporate customers in the making of travel arrangements and providing corporate travel

management services. (Declaration of Jorge Cruz ("Cruz Decl.") (App. at ECF 70-5, p. 2)[1], ¶ 3;

Deposition of Michael Janssen ("Janssen Dep.") (App. at ECF 70-1, p. 4), 6:12-18; Joint Statement

of Undisputed Facts ("JSOF"), ECF 69, ¶ 1).

2.      BCD is an equal opportunity employer and maintains an Equal Employment

Opportunity/Affirmative Action Policy, which states in relevant part: "It is our policy that no

employee or applicant will be discriminated against because of race, color, religion, political

---

[1] Pursuant to the Court's August 4, 2025 Summary Judgment Scheduling Order, references to
"App. at ECF __" refers to the location of the evidence set forth in Defendant's Appendix of
Record Evidence in Support of its Motion for Summary Judgment filed on September 18, 2025 at
ECF 70.

opinion, sex, national or social origin, age, marital status, genetic information, disability or because he or she is a protected veteran." (Declaration of Ursula Dvorkin ("Dvorkin Decl.") (App. at ECF 70-6, pp. 2, 6-7), ¶ 4, Exhibit 1).

3.      BCD also maintains a Harassment Policy, which states in relevant part: "In accordance with applicable law, we prohibit sexual harassment and harassment because of race, color, national origin, ancestry, religion, creed, sexual orientation, physical or mental disability, marital status, medical condition, veteran status, age, or any other basis protected by federal, state, or local law. All such harassment is unlawful and will not be tolerated." (Dvorkin Decl. (App. at ECF 70-6, pp. 2-3, 8-9), ¶ 5, Exhibit 2).

4.      Ms. Blough acknowledged that she had received a copy of BCD's Employee Handbook, which contains BCD's Equal Employment Opportunity/Affirmative Action Policy, when she started her employment with BCD. (Deposition of Trudy Blough ("Blough Dep.") (App. at ECF 70-2, pp. 48, 66), 174:8-22, Exhibit 14; JSOF (ECF 69) ¶ 2).

5.      BCD has operations, sales employees and clients in locations across the globe including North and South America, Europe, Africa, Middle East and Asia. (Cruz Decl. (App. at ECF 70-5, p. 2), ¶ 4).

6.      Moreover, BCD services clients in diverse industries, including media and entertainment, aerospace and defense, energy, and life sciences. (Cruz Decl. (App. at ECF 70-5, p. 2), ¶ 5).

7.      In global sales, BCD utilizes a team-selling approach, meaning that there is often a global sales lead assigned to a prospect, but other BCD employees are assigned to the team to help secure the business and drive growth through collaboration. For example, in many cases a regional BCD employee is assigned to a specific client to help develop and drive the strategy in that specific

2

region. Under the team-selling approach, the team could include specific industry and subject matter experts and others in the organization who have existing relationships with prospective clients. (Deposition of Jorge Cruz ("Cruz Dep.") (App. at ECF 70-3, pp. 5, 15, 20-21), 13:11-21, 59:5-18, 76:18-77:3; JSOF (ECF 69) ¶ 3; Cruz Decl. (App. at ECF 70-5, p. 3), ¶ 8).

8.     BCD's practice of assigning current or prospective client accounts to its global sales teams takes into consideration multiple factors. (Cruz Dep. (App. at ECF 70-3, pp. 6-7, 9-10), 21:9-22:21, 49:21-50:10; Janssen Dep. (App. at ECF 70-1, pp. 5-6), 11:25-12:9; JSOF (ECF 69) ¶ 4).

9.     Prospective accounts or opportunities are assigned to employees or sales teams based on several different factors, including but not limited to: an employee/sales team's geographic proximity to a client's principal location and the location of the decisionmaker; the timing of a request for proposal for the prospective client; the salesperson's experience with and knowledge of the client or prospect and its industry; previously established client relationships; and the salesperson's overall sales seniority/experience, current workload/bid activity, and work history, with no single factor being dispositive. (Cruz Decl. (App. at ECF 70-5, p. 3), ¶ 9; Cruz Dep. (App. at ECF 70-3, pp. 6-7, 9-10), 21:9-22:21, 49:21-50:10; Janssen Dep. (App. at ECF 70-1, pp. 5-6), 11:25-12:9).

10.     Additionally, when a salesperson leaves the Company, a portion of that salesperson's pipeline generally remains unassigned to ensure that there will be prospects for the salesperson who is hired to fill that position, though accounts with imminent bids or active bids in progress typically would be reassigned to an existing salesperson. (Cruz Dep. (App. at ECF 70-3, p. 17), 61:13-17; JSOF (ECF 69) ¶ 5).

4898-3038-6272

## II.   PLAINTIFF'S EMPLOYMENT WITH BCD

11.   Ms. Blough began her employment with BCD in February of 2012 as an Account Manager and was promoted to Director, Regional Sales – Northeast Territory in June 2014. (Blough Dep. (App. at ECF 70-2, pp. 50-53), Exhibit 1; JSOF (ECF 69) ¶ 6).

12.   In that role, prospects were identified for the directors based on where the client was located; sometimes determined by where the company's headquarters were located and sometimes determined by where the travel manager was located. (Blough Dep. (App. at ECF 70-2, pp. 4-5), 35:22-36:2; JSOF (ECF 69) ¶ 7).

13.   Ms. Blough was promoted to the Vice President, Global Sales position on or about July 9, 2018. (Blough Dep. (App. at ECF 70-2, pp. 13, 50-53), 64:18-20, Exhibit 1; Offer Letter, ECF 21-2, p. 2; JSOF (ECF 69) ¶ 8).

14.   Ms. Blough was offered the Vice President, Global Sales position after interviewing with Jorge Cruz, Executive Vice President, Global Sales and Marketing, and speaking with Debra Cruz, Vice President, Global Sales, and Mark O'Brien, Vice President, Global Sales. (Blough Dep. (App. at ECF 70-2, p. 7), 55:5-15; Cruz Dep. (App. at ECF 70-3, pp. 3-4), 4:24-5:1; JSOF (ECF 69) ¶ 9).

15.   She had an annual salary, and she was eligible to earn commissions. (Offer Letter, ECF 21-2, p. 2; JSOF (ECF 69) ¶ 10).

16.   In that role, Ms. Blough worked remotely from the greater Pittsburgh area and reported to Mr. Cruz. (Cruz Decl. (App. at ECF 70-5, p. 4), ¶ 15; Offer Letter, ECF 21-2, p. 2; JSOF (ECF 69) ¶ 11).

4898-3038-6272

17.     Ms. Blough did not have any previous experience in global sales when she was offered the Vice President, Global Sales role. (Cruz Dep. (App. at ECF 70-3, pp. 22), 84:7-20; Cruz Decl. (App. at ECF 70-5, p. 4), ¶ 16).

18.     Before Ms. Blough was offered the position, Mr. Cruz told Ms. Blough that in order to be successful in this new role, she would need to develop her sales skills. (Cruz Decl. (App. at ECF 70-5, p. 4), ¶ 17).

19.     In making the decision to hire Ms. Blough, Mr. Cruz believed that she would do well in the position despite her lack of global sales experience. (Cruz Decl. (App. at ECF 70-5, p. 4), ¶ 19).

20.     Ms. Blough's job duties included soliciting prospective clients and selling BCD products and services for corporate travel needs. (Cruz Decl. (App. at ECF 70-5, p. 4), ¶ 21).

21.     When Ms. Blough started in this new role in 2018, she retained accounts from her Regional Sales Director position in her pipeline where a request for proposal was active. (Blough Dep. (App. at ECF 70-2, p. 8-9), 56:18-57:6; JSOF (ECF 69) ¶ 12).

22.     At Mr. Cruz's direction in the fall of 2018, Debra Cruz and Susan Altman, both Vice Presidents of Global Sales, also gave her five prospects in their sales pipeline. (Blough Dep. (App. at ECF 70-2, pp. 11, 54-57), 59:15-24, Exhibit 5; JSOF (ECF 69) ¶ 13).

23.     In addition, Ms. Blough received new sales prospects from Mr. Cruz throughout the remainder of her employment. (Cruz Decl. (App. at ECF 70-5, p. 5), ¶ 24).

24.     Ms. Blough was assigned accounts and prospective clients to her pipeline through her employment with BCD as Vice President, Global Sales or was allowed to maintain these prospects or accounts after being promoted to the Vice President role. (Cruz Decl. (App. at ECF 70-5, pp. 5-6), ¶¶ 25-26; Blough Dep. (App. at ECF 70-2, pp. 8-9), 56:18-57:6).

4898-3038-6272

25.    While in the Vice President role, Mr. Cruz assigned the following prospective clients/opportunities to Ms. Blough for purposes of her pipeline:

| Opportunity | Assignment Date |
|---|---|
| Avaya | 4/15/2019 |
| BlackRock | 7/23/2018 |
| Becton Dickinson | 9/1/2018 |
| Boston Scientific | 9/4/2019 |
| Colgate-Palmolive | 7/23/2018 |
| Dell | 7/23/2018 |
| Ecolab | 5/1/2019 |
| Eli Lilly | 7/23/2018 |
| Estee Lauder Global | 7/1/2018 |
| Halliburton | 6/25/2018 |
| John Deere | 5/15/2019 |
| Johnson & Johnson | 5/14/2019 |
| Kimberly Clark | 5/15/2019 |
| Koch Holdings | 3/11/2019 |
| KPMG Americas | 7/1/2018 |
| Medtronic | 5/15/2019 |
| Morgan Stanley | 8/29/2019 |
| Novo Nordisk | 4/16/2019 |
| Publicis Global | 4/8/2019 |
| SAIC | 4/25/2019 |
| Schlumberger | 5/27/2021 |
| Technip FMC | 11/1/2019 |
| Thomson Reuters | 7/23/2018 |
| Walmart | 7/3/2018 |

(Cruz Decl. (App. at ECF 70-5, p. 5), ¶ 25; Blough Dep. (App. at ECF 70-2, pp. 12-21), 63:19-72:13).

26.    Additionally, Ms. Blough was assigned the following accounts while in her Regional Sales Director role under Rossana Martin and was permitted to remain the lead salesperson after her promotion to Vice President, Global Sales: Air Products, Bain & Company, Boehringer Ingelheim, Cigna, CVS Health, L Brands, Massachusetts Mutual Life Insurance, Paraxel, State Street Corporation, Thermo Fisher Scientific, UPS, and XL Catlin. (Blough Dep.

6

4898-3038-6272

(App. at ECF 70-2, pp. 10-11), 58:18-59:4; JSOF (ECF 69) ¶ 14; Cruz Decl. (App. at ECF 70-5, p. 5-6), ¶ 26).

27.     The other Vice Presidents in Global Sales were located around the world. (Blough Dep. (App. at ECF 70-2, p. 7-8), 55:16-56:8; JSOF (ECF 69) ¶ 15).

28.     Specifically, Susan Altman lived in Chicago, Ms. Cruz lived in California, Vanessa Moore lived in Australia, Mark O'Brien lived in the United Kingdom, and Sachin Sekhri lived in New Jersey. (Cruz Decl. (App. at ECF 70-5, p. 6), ¶¶ 28-29; Blough Dep. (App. at ECF 70-2, pp. 7-8), 55:16-56:8).

29.     The locations of the Vice Presidents in Global sales were strategic to maximize sales opportunities for BCD. (Cruz Decl. (App. at ECF 70-5, p. 6), ¶ 27).

30.     Andy Menkes, Senior Vice President, Global Client Solutions, was assigned to the sales teams for prospective clients UPS and Becton Dickinson. (Janssen Dep. (App. at ECF 70-1, pp. 9-10), 15:22-16:12; Deposition of Andrew Menkes ("Menkes Dep.") (App. at ECF 70-4, p. 4), 10:7-10; JSOF (ECF 69) ¶ 16).

31.     Mr. Menkes was assigned to the sales teams for these prospective client accounts in order to support Ms. Blough's sales efforts and to put the Company in the best place to win new business. (Cruz Decl. (App. at ECF 70-5, p. 6), ¶ 30).

32.     Mr. Menkes is a consultant in the travel industry. BCD hired him as an employee of BCD with an employment contract for approximately two years from 2018-2020 to help BCD support its sales teams and to utilize Mr. Menkes's relationships in the industry to assist BCD in winning bids. (Janssen Dep. (App. at ECF 70-1, pp. 7-9), 13:21-23, 14:24-15:7; Menkes Dep. (App. at ECF 70-4, pp. 3-5), 7:12-16, 10:4-6, 11:1-3; JSOF (ECF 69) ¶ 17).

4898-3038-6272

33.     Mr. Menkes was added to sales teams of prospective clients with which he had a previous relationship in his capacity as a consultant, as he was able to add value through his connections. (Cruz Decl. (App. at ECF 70-5, p. 6), ¶ 32).

34.     Mr. Menkes did not have the same position as Ms. Blough, had no sales quota, earned no commissions, and reported directly to Michael Janssen, Chief Commercial Officer. (Janssen Dep. (App. at ECF 70-1, pp. 3, 8-10), 5:16-17, 14:24-15:13, 16:17-24; Menkes Dep. (App. at ECF 70-4, pp. 5-6), 11:20-12:2; JSOF (ECF 69) ¶ 18).

35.     Mr. Menkes assisted with the bid for UPS's business during his employment with BCD, and the bid was closed as lost in August 2019. (Cruz Decl. (App. at ECF 70-5, p. 6), ¶ 33; Blough Dep. (App. at ECF 70-2, pp. 26, 28), 101:9-11, 105:10-12; JSOF (ECF 69) ¶ 19).

36.     Mr. Menkes knew the UPS travel manager. (Blough Dep. (App. at ECF 70-2, p. 27), 104:12-20; JSOF (ECF 69) ¶ 20).

37.     Mr. Menkes's relationship with UPS's travel manager went back some time. (Blough Dep. (App. at ECF 70-2, p. 27), 104:12-20).

38.     Mr. Menkes also assisted with the bid for Becton Dickinson's business during his employment with BCD, and the bid was closed as lost in May 2020. (Cruz Decl. (App. at ECF 70-5, p. 6), ¶ 34; JSOF (ECF 69) ¶ 21).

39.     Mr. Menkes knew the travel manager at Becton Dickinson. (Blough Dep. (App. at ECF 70-2, p. 25), 100:8-16; JSOF (ECF 69) ¶ 22).

40.     Mr. Menkes had a long-standing relationship with the travel manager at Becton Dickinson. (Blough Dep. (App. at ECF 70-2, p. 25), 100:8-16).

41.     During the time he was employed, Mr. Menkes's assigned role with the sales teams was as a senior internal consultant. He was not the assigned salesperson responsible for either the

4898-3038-6272

UPS bid or the Becton Dickinson bid; Ms. Blough remained the global sales lead for the opportunity on the UPS and Becton Dickinson bids. Ms. Blough was eligible to earn commissions if BCD was successful in its bids. (Blough Dep. (App. at ECF 70-2, p. 25), 100:17-20; Cruz Dep. (App. at ECF 70-3, pp. 12-13), 56:7-16, 57:10-25; Menkes Dep. (App. at ECF 70-4, p. 8), 21:9-19; JSOF (ECF 69) ¶ 23).

42.    Mr. Menkes was not eligible to earn commissions if BCD was successful in its bids. (Menkes Dep. (App. at ECF 70-4, p. 6), 12:1-2; JSOF (ECF 69) ¶ 24).

43.    Mr. Menkes also assisted other sales leads, including Rossana Martin and Debra Cruz, with their prospecting efforts. (Blough Dep. (App. at ECF 70-2, p. 29), 107:16-22; Menkes Dep. (App. at ECF 70-4, p. 7), 15:1-6; JSOF (ECF 69) ¶ 25).

44.    For example, Mr. Menkes was assigned to work on the sales teams for the IBM, Credit Suisse, and Capital One opportunities. (Cruz Decl. (App. at ECF 70-5, p. 7), ¶ 38).

45.    Similarly, Kessie Bratko, Senior Vice President, Global Client Team, was assigned to the sales team for Johnson & Johnson as support for Ms. Blough in November 2019, an account that was assigned to Ms. Blough in May 2019. (Janssen Dep. (App. at ECF 70-1, pp. 11-12), 44:25-45:3; Cruz Dep. (App. at ECF 70-3, pp. 14-15), 58:19-59:4; JSOF (ECF 69) ¶ 26).

46.    Ms. Bratko was also added to the sales team for Eli Lilly around the same time that Ms. Bratko was added to the Johnson & Johnson sales team. (Blough Dep. (App. at ECF 70-2, p. 37), 130:6-9).

47.    The bid for Eli Lilly's business was closed as lost in February 2020. (Cruz Decl. (App. at ECF 70-5, p. 7), ¶ 42).

48.    Ms. Bratko was considered a subject matter expert in the travel needs of large pharmaceutical companies who was leading BCD's largest pharmaceutical accounts when she

4898-3038-6272

joined the Johnson & Johnson team. (Janssen Dep. (App. at ECF 70-1, pp. 11-12), 44:7-45:18; JSOF (ECF 69) ¶ 27).

49.    Because of her knowledge and experience, Ms. Bratko was added to the Johnson & Johnson pitch team to be part of the team to present to the prospect and to formulate strategy to help BCD differentiate from other TMCs in the travel industry. (Janssen Dep. (App. at ECF 70-1, p. 12), 45:11-18; JSOF (ECF 69) ¶ 28).

50.    Ms. Bratko was not the assigned sales lead on the Johnson & Johnson account, and she was already servicing a portion of the Johnson & Johnson account. Due to her pharmaceutical and life sciences expertise generally and experience with Johnson & Johnson, she was added to the sales team for this potential expansion opportunity led by Ms. Blough. (Cruz Dep. (App. at ECF 70-3, pp. 15-16), 59:19-60:14; JSOF (ECF 69) ¶ 29).

51.    Ms. Blough understood that Ms. Bratko was not eligible for incentive compensation in her role. (Blough Dep. (App. at ECF 70-2, p. 36), 127:19-23; JSOF (ECF 69) ¶ 30).

52.    To try to expand the work BCD did with Johnson & Johnson, Ms. Blough was the global lead and remained the global lead responsible for facilitating the response to the RFP, the deliverables, and the timeline in which BCD submitted answers to Johnson & Johnson's questions. (Cruz Dep. (App. at ECF 70-3, p. 16), 60:21-25; JSOF (ECF 69) ¶ 31).

53.    Throughout her employment as Vice President, Global Sales beginning in July 2018, Ms. Blough and Mr. Cruz had numerous conversations regarding Ms. Blough's pipeline. (Cruz Dep. (App. at ECF 70-3, pp. 11, 18), 52:7-14, 62:16-23; Blough Dep. (App. at ECF 70-2, p. 22), 78:12-13; Cruz Decl. (App. at ECF 70-5, p. 8), ¶ 45).

10

4898-3038-6272

54.      In these conversations, Mr. Cruz explained to Ms. Blough how accounts and new opportunities are assigned and that there are many factors taken into consideration when assigning accounts, including where the opportunity arose, what vice president would be geographically close to the client, industry experience, and existing relationships, among other things. (Cruz Dep. (App. at ECF 70-3, pp. 11, 18), 52:7-14, 62:16-23; Cruz Decl. (App. at ECF 70-5, p. 8), ¶ 46).

55.      Ms. Blough, like most salespeople who earn commissions, wanted more prospects in her pipeline. (Cruz Dep. (App. at ECF 70-3, pp. 11, 18), 52:7-14, 62:16-23; Cruz Decl. (App. at ECF 70-5, p. 8), ¶ 50; JSOF (ECF 69) ¶ 32).

56.      In late 2019, Ms. Blough's pipeline was appropriate given her experience, skillset, geography, and industry sector. (Cruz Dep. (App. at ECF 70-3, pp. 18-19), 62:24-63:3; JSOF (ECF 69) ¶ 33).

57.      Indeed, throughout her employment, Ms. Blough's pipeline was appropriate given her experience, skillset, geography, and industry sector. (Cruz Decl. (App. at ECF 70-5, p. 8), ¶ 51).

58.      In approximately March 2021, Debra Cruz, another Vice President of Global Sales was transferred from the global sales team to the media and entertainment team. (Cruz Decl. (App. at ECF 70-5, p. 7), ¶ 43; JSOF (ECF 69) ¶ 34).

59.      Ms. Cruz's transfer to the media and entertainment team left several accounts unassigned, and these accounts were not immediately assigned to any other employee, as these bids were either not active or were needed to preserve a pipeline of work for any new sales employees hired. (Cruz Decl. (App. at ECF 70-5, p. 7), ¶ 44; JSOF (ECF 69) ¶ 35).

60.      Ms. Cruz and Mr. Cruz are married to each other. (Cruz Decl. (App. at ECF 70-5, p. 8), ¶ 52; JSOF (ECF 69) ¶ 36).

11

61.     Ms. Cruz has never reported directly to Mr. Cruz. (Cruz Decl. (App. at ECF 70-5, p. 8), ¶ 53; Cruz Dep. (App. at ECF 70-3, pp. 8), 35:15-25).

62.     Mr. O'Brien was a Vice President of Global Sales in the United Kingdom. After his termination in approximately March 2021, many of his accounts were reassigned to other global sales leaders who were in close proximity to the decisionmakers of the clients or prospects. (Cruz Decl. (App. at ECF 70-5, pp. 8-10), ¶¶ 54-55).

63.     After the end of Mr. O'Brien's employment in approximately March 2021, many of his accounts were reassigned to other global sales leaders who were in close proximity to the decisionmakers of the clients or prospects or otherwise had relevant experience or some other factor that would be beneficial for handling those accounts. With respect to the accounts that Ms. Blough alleges were Mr. O'Brien's and were assigned to other sales employes but should have been assigned to her following Mr. O'Brien's departure, the following is list of how those account assignments were handled:

> a.  GlaxoSmithKline was never assigned to Mr. O'Brien, and it was not transferred following Mr. O'Brien's separation from BCD prior to Ms. Blough's resignation.
>
> b.  Novartis was assigned to Mr. Sekhri on April 22, 2021 because of Mr. Sekhri's experience in the life sciences sector (and was later reassigned to a different male Vice President of Global Sales whose experience indicated to BCD that he would provide the best opportunity to win the business after Ms. Blough's resignation).
>
> c.  Mars was assigned to Vanessa Moore, Vice President, Global Sales from Mr. O'Brien on March 2, 2020, and from Ms. Moore to Mr. Sekhri on January 21, 2021. It was not transferred between Mr. O'Brien's separation from BCD and Ms. Blough's resignation.

12

4898-3038-6272

d.   GE was not assigned to Mr. O'Brien at the time of his separation. Mr. O'Brien transferred the GE prospective account to Debra Cruz on November 6, 2020.

e.   Bank of America was never assigned to Mr. O'Brien. It had been assigned between Ms. Cruz and Susan Altman, with Ms. Cruz being assigned as the sales lead start in 2019. On August 12, 2021, Bank of America was assigned from Ms. Cruz to Jorge Cruz as a result of Ms. Cruz's portfolio shifting after she moved into the Media & Entertainment role after Mr. Cruz discussed it with Bank of America.

f.   Airbus was transferred from Mr. O'Brien to Ton Maanicus on October 25, 2019, who was based in Belgium, as Mr. Maanicus speaks French and was in region, as the Airbus decision makers are based in France. This transfer took place before Mr. O'Brien's separation.

g.   Royal Dutch Shell was transferred to Mr. Maanicus on April 13, 2021, again due to proximity to decision makers and skillset.

h.   Phillip Morris was not assigned to Mr. O'Brien or Mr. Maanicus during Ms Blough's employment as Vice President.

i.   British American Tobacco was transferred to Tony McGetrick, Vice President of UK and Ireland Sales, on May 17, 2021, due to his proximity to decisionmakers, as British American Tobacco is a company based out of the United Kingdom.

j.   Unilever was transferred from Mr. O'Brien to Nick Dewey on April 13, 2021, as it was a global opportunity being led of the United Kingdom where Nick Dewey, was based.

k.   Barclays has been assigned to a United Kingdom-based BCD salesperson since prior to 2017, as Barclays is headquartered out of the UK. There were no

13

opportunity ownership changes for Barclays during Ms. Blough's employment as a Vice President, and it was not reassigned after Mr. O'Brien's separation.

l. BASF has a Germany-based headquarters, so it has always had a German or European-based BCD salesperson assigned. There were no opportunity ownership changes for BASF during Ms. Blough's employment as a Vice President, and it was not reassigned after Mr. O'Brien's separation.

(Cruz Decl. (App. at ECF 70-5, pp. 9-10), ¶ 55).

64.     Ms. Blough admitted that she had no prior relationship with any of Mr. O'Brien's accounts that were assigned to other sales employees. (Blough Dep. (App. at ECF 70-2, p. 24), 82:16-18).

65.     Ms. Blough was assigned to the Schlumberger account on May 27, 2021, following Mr. O'Brien's separation from BCD. This account has previously been assigned to Mr. O'Brien. (Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 57).

66.     Not all of Mr. O'Brien's prospective accounts were reassigned following his termination, as BCD kept a pipeline intact for future employees. (Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 58).

## III.    PLAINTIFF'S COMMISSION PLANS

67.     Under the terms of the Sales Incentive Plans (SIPs) that provided Ms. Blough with the ability to receive commissions in 2020 and 2021, "During the first six months of ticketing, commissions will not be paid until there is a fully executed customer contract." (2020 SIP, ECF 15-1, p. 11, Section C; 2021 SIP, ECF 15-1, p. 24 Section C; JSOF (ECF 69) ¶ 37).

68.     Under the terms of the SIPs that provided Ms. Blough with the ability to receive commissions in 2020 and 2021, a salesperson "must be an employee of BCD Travel on the date

that commissions are paid to be eligible to receive that commission. All unpaid sales commissions, bonuses and incentives are forfeited upon termination of employment for any reason." (2020 SIP, ECF 15-1, p. 14, Section P; 2021 SIP, ECF 15-1, p. 27 Section N; JSOF (ECF 69) ¶ 38).

69.    Under the terms of the SIPs that provided Ms. Blough with the ability to receive commissions in 2020 and 2021, the SIPs could be "amended, modified, or terminated at any time by BCD Travel without prior notice." (2020 SIP, ECF 15-1, p. 15, Section Q; 2021 SIP, ECF 15-1, p. 27 Section O; JSOF (ECF 69) ¶ 39).

## IV.    BCD'S COMPANY-WIDE SUSPENSION OF SALES COMMISSION EARNINGS

70.    During the COVID-19 pandemic, travel was restricted areas across the globe and as a result, BCD's income precipitously declined, as BCD generates much of its revenue based on travel transactions completed by its clients. (Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 59).

71.    Since its global salespeople's commissions are largely based upon the travel transactions its clients make during the first 15 months of an engagement, with the severe drop-off in corporate travel, BCD's salespeople would not be earning much, if any commissions on corporate travel. (Blough Dep. (App. at ECF 70-2, pp. 42-43, 67-70), 140:15-141:7, Exhibits 15-16; Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 60; JSOF (ECF 69) ¶ 40).

72.    As a result, both due to in the lost income to the company and the loss of commissions for its salespeople, BCD made the decision to suspend the commission earning window for Q2 through Q4 of 2020. (Blough Dep. (App. at ECF 70-2, pp. 42-43, 67-70), 140:15-141:7, Exhibits 15-16; Cruz Decl. (App. at ECF 70-5, p. 11), ¶¶ 60-61; JSOF (ECF 69) ¶ 40).

73.    This essentially shifted the period of time in which commissions could be earned to the end of the otherwise applicable period, so that employees would be able to earn more

commissions as travel resumed. (Blough Dep. (App. at ECF 70-2, pp. 42-43, 67-70), 140:15-141:7, Exhibits 15-16; Cruz Decl. (App. at ECF 70-5, p. 11), ¶¶ 61-62; JSOF (ECF 69) ¶ 40).

74.    This deferred earnings window allowed sales team members to benefit from returning transactions at a later date. (Blough Dep. (App. at ECF 70-2, pp. 42-43, 67-70), 140:15-141:7, Exhibits 15-16; Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 62; JSOF (ECF 69) ¶ 41).

75.    The deferral of commissions for these quarters was applied to all individual contributors who earned commissions at BCD; it was not restricted to Ms. Blough. (Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 63; Blough Dep. (App. at ECF 70-2, pp. 67-70), Exhibits 15-16; JSOF (ECF 69) ¶ 42).

76.    Ms. Blough agreed to the deferment of commissions under this program. (Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 64; Blough Dep. (App. at ECF 70-2, pp. 43, 69-70), 176:1-4, Exhibit 16; JSOF (ECF 69) ¶ 43).

77.    The suspension of the earning of commissions remained in effect though the time when Ms. Blough resigned and left BCD. (Blough Dep. (App. at ECF 70-2, p. 43), 141:9-11; JSOF (ECF 69) ¶ 44).

78.    Ms. Blough expected to start receiving commissions on the sale of Halliburton in May of 2020, but the deferral program went into effect in March of 2020 and was not lifted prior to her resignation from BCD. (Blough Dep. (App. at ECF 70-2, pp. 39-43), 137:13-141:11).

79.    The signing of the contract for the Boston Scientific was not executed during Ms. Blough's employment, as it was executed on April 25, 2022. (Cruz Decl. (App. at ECF 70-5, p. 12), ¶ 68).

4898-3038-6272

## V.   PLAINTIFF'S COMPLAINT DURING HER EMPLOYMENT

80.    In February 2019, Ms. Blough approached a colleague, Kathy Jackson, former Executive Vice President, Global Program Management, at a BCD event and expressed some concerns about the way she was being treated in her role. (Blough Dep. (App. at ECF 70-2, pp. 30-31), 109:15-25, 110:4-9).

81.    Specifically, Ms. Blough told Ms. Jackson that she felt that she was not being respected in the Vice President, Global Sales role and that she had addressed concerns about the sufficiency of her pipeline with Mr. Cruz multiple times, but Mr. Cruz was not responsive or receptive to those concerns. (Blough Dep. (App. at ECF 70-2, p. 31), 110:4-9).

82.    On or around Feb 28, 2019, during that same conference, Ms. Jackson informed Yvette Bryant, Senior Vice President, Human Resources, that Ms. Blough had some work concerns but was reluctant to bring them forward. (Declaration of Yvette Bryant ("Bryant Decl.,") (App. at ECF 70-7, p. 2), ¶ 4).

83.    Ms. Bryant told Ms. Jackson that it would be best for Ms. Blough to reach to her directly to discuss, but also offered that if Ms. Blough preferred, Ms. Bryant could initiate the call because Ms. Bryant did not want to leave her concerns unaddressed. (Bryant Decl. (App. at ECF 70-7, p. 2), ¶ 5).

84.    On March 5, 2019, since Ms. Bryant had not heard from Ms. Blough, Ms. Bryant sent her an email asking if Ms. Blough would like to connect about her concerns. (Bryant Decl. (App. at ECF 70-7, pp. 3, 5-8), ¶ 6, Exhibit 1).

85.    Following this, Ms. Bryant had a telephone conversation with Ms. Blough in which Ms. Blough stated her concerns about her level of support and opportunities in the sales team and interactions with her supervisor, Mr. Cruz. During the conversation, Ms. Blough said she was

17

hesitant to raise the issue to Human Resources and get Human Resources involved because she feared it would make things awkward or escalate unnecessarily. (Bryant Decl. (App. at ECF 70-7, p. 3), ¶ 7).

86.     On this call, Ms. Blough stated her preference was first to speak with Mr. Cruz and address her concerns directly with him.  Ms. Blough and Ms. Bryant agreed that she would do so, but would keep Ms. Bryant updated on how things went. (Bryant Decl. (App. at ECF 70-7, p. 3), ¶ 8; Blough Dep. (App. at ECF 70-2, pp. 32-33), 113:2-114:3).

87.     Ms. Blough did not raise any claims about a hostile work environment or sex discrimination in her conversation with Ms. Bryant. (Bryant Decl. (App. at ECF 70-7, pp. 3, 5-8), ¶ 9, Exhibit 1).

88.     On March 14, 2019, having received no follow-up from Ms. Blough after their phone conversation, Ms. Bryant sent her an email requesting an update and also asking her if she had changed her mind and wanted Human Resources to get involved more directly. (Bryant Decl. (App. at ECF 70-7, pp. 3, 5-8), ¶ 10, Exhibit 1; Blough Dep. (App. at ECF 70-2, p. 34), 116:17-25, Exhibit 7).

89.     On the same day, Ms. Blough replied that the prior week's call with Mr. Cruz had been canceled and the current week's call had also been canceled due to a death in Mr. Cruz's family, so she had not yet had an opportunity to discuss with Mr. Cruz, but she still planned to do so. (Bryant Decl. (App. at ECF 70-7, pp. 3, 5-8), ¶ 11, Exhibit 1).

90.     On April 10, 2019, Ms. Bryant sent Ms. Blough another follow up email, asking Ms. Blough again for an update or if she needed assistance addressing the concerns with Mr. Cruz. (Bryant Decl. (App. at ECF 70-7, pp. 4-8), ¶ 12, Exhibit 1).

91.     In response, Ms. Blough emailed Ms. Bryant, stating:

18

> Hi Yvette. Yes, I am so sorry. We did talk last week and everything is good[,] and he heard my concerns. We had a good talk and he was out of the country for many months after I accepted this position things seem to be at a normal now with no further concerns or issues. We are all good. 😊

(Bryant Decl. (App. at ECF 70-7, pp. 4-8), ¶ 13, Exhibit 1).

92.    Ms. Blough raised no concerns about alleged sex discrimination, a hostile work environment claim, or that she believed she was being paid less than male colleagues in her discussions with Ms. Bryant.  (Bryant Decl. (App. at ECF 70-7, pp. 3-8), ¶¶ 10, 14, Exhibit 1).

93.    Ms. Blough did not raise any other concerns with Ms. Bryant about her employment with BCD. (Bryant Decl. (App. at ECF 70-7, p. 4), ¶ 15; Blough Dep. (App. at ECF 70-2, p. 35), 117:7-9).

## VI.    PLAINTIFF'S RESIGNATION

94.    On October 14, 2021, Ms. Blough resigned over the phone with Mr. Cruz. (Blough Dep. (App. at ECF 70-2, pp. 44-45), 152:12-153:7; Cruz Decl. (App. at ECF 70-5, p. 11), ¶ 66; JSOF (ECF 69) ¶ 45).

95.    In that phone conversation, Ms. Blough stated that she was leaving because she had been "trying to get him to right-set [her] pipeline for years; that [she didn't] feel like she was respected, that [she] was valued; and that … [she] was embarrassed by the way he treated [her] and the way he handled the opportunities." (Blough Dep. (App. at ECF 70-2, p. 45), 153:8-19; JSOF (ECF 69) ¶ 46).

96.    She further stated that she "had gone through stress and anxiety and … was at the point where [she] just couldn't do it anymore." (Blough Dep. (App. at ECF 70-2, p. 45), 153:8-19; JSOF (ECF 69) ¶ 47).

4898-3038-6272

97.     Ms. Blough followed her verbal resignation with an email alleging that she was forced to resign due to unbearable conditions that were causing her extreme stress, that she had an inadequate pipeline, lacked a sufficient level of authority and responsibility to run sales efforts as compared to her peers or even regional sales team members, and that assignments were not made to her as promised or in a fair manner, making her feel embarrassed and allegedly forcing her to resign. (Blough Dep. (App. at ECF 70-2, pp. 44-45), 152:18-153:7, Exhibit 11).

98.     Upon receiving Ms. Blough's resignation email, Mr. Cruz notified the Human Resources Department. Ursula Dvorkin, Senior Human Resource Business Partner, opened an investigation into Ms. Blough's claims. (Dvorkin Decl. (App. at ECF 70-6, p. 3), ¶¶ 7-8).

99.     On October 15, 2021, Ms. Dvorkin interviewed Ms. Blough. During this conversation, Ms. Blough once again focused on the inadequacy of her pipeline. (Blough Dep. (App. at ECF 70-2, p. 45-47), 155:11-156:12; Dvorkin Decl. (App. at ECF 70-6, pp. 3, 11), ¶ 9, Exhibit 3).

100.    At no point did Ms. Blough allege that her lack of a pipeline was because Mr. Cruz was favoring her male colleagues or his wife or that she was otherwise subjected to discrimination based on her gender or subjected to a hostile work environment. (Dvorkin Decl. (App. at ECF 70-6, pp. 3, 11), ¶ 10, Exhibit 3).

101.    She did not claim BCD was paying her less than her peers based on her gender or that there were commissions that she was owed and did not receive. (Dvorkin Decl., (App. at ECF 70-6, pp. 4, 11) ¶ 11, Exhibit 3).

102.    Rather, Ms. Blough reported to Ms. Dvorkin that she felt that from the time she started in the global sales position her accounts were not strategic, had low impact and that she

20

4898-3038-6272

had low commission opportunities. (Dvorkin Decl. (App. at ECF 70-6, pp. 102, 11), ¶ 12, Exhibit 3).

103.    She also reported that she was embarrassed on several calls where someone other than her, usually an individual in a regional role, was leading the calls and not her, which affected her self-esteem. (Dvorkin Decl. (App. at ECF 70-6, pp. 4, 11), ¶ 13, Exhibit 3).

104.    Ms. Blough gave several examples of how she felt her pipeline was lacking. Specifically, she claimed that none of Mark O'Brien's accounts were assigned to her after his termination in 2021, that Debra Cruz maintained some of her non-entertainment accounts after she moved into the Media and Entertainment role, and that Ms. Blough felt that some of these accounts could have been transferred to her.  (Dvorkin Decl. (App. at ECF 70-6, pp. 4, 11), ¶ 14, Exhibit 3).

105.    At no point did Ms. Blough tell Ms. Dvorkin that she believed she did not receive more or better opportunities due to her gender. (Dvorkin Decl. (App. at ECF 70-6, p. 4), ¶ 17).

106.    Instead, Ms. Blough simply complained that when Mark O'Brien left BCD and Ms. Cruz transferred out of the global sales team earlier that year, none of their accounts were reassigned to her. (Dvorkin Decl. (App. at ECF 70-6, p. 5), ¶ 18).

107.    When Ms. Dvorkin asked Mr. Cruz about how he reassigned Mr. O'Brien's accounts, Mr. Cruz explained that they were reassigned largely based on geographic proximity to the client and the decisionmaker. (Dvorkin Decl. (App. at ECF 70-6, p. 5), ¶ 19).

108.    Mr. O'Brien was a Vice President of Global Sales in the United Kingdom. Many of his accounts were reassigned to other global sales leaders who were in close proximity to the decisionmakers of the clients or prospects. (Cruz Decl. (App. at ECF 70-5, p. 8-10), ¶¶ 54-55).

109.    Based on the information Ms. Blough and Mr. Cruz provided, Ms. Dvorkin did not conclude that Ms. Blough was treated unfairly. (Dvorkin Decl. (App. at ECF 70-6, p. 5), ¶ 20).

4898-3038-6272

110.    Ms. Blough was the sales lead for Boston Scientific. The contract was in the process of being signed when Ms. Blough resigned from BCD, and it was not signed until after her termination from BCD's employment. (Blough Dep. (App. at ECF 70-2, p. 43), 141:12-23; JSOF (ECF 69) ¶ 48).

111.    The Boston Scientific contract was executed on April 25, 2022, after Ms. Blough's termination from BCD. (Cruz Decl. (App. at ECF 70-5, p. 12), ¶ 68).

112.    Ms. Blough filed a charge of discrimination with the EEOC on June 13, 2022 alleging, *inter alia*, that she was discriminated against based on her sex, was discriminated against in violation of the Equal Pay Act, and that she was subjected to a hostile work environment. (JSOF (ECF 69) ¶ 49).

## VII.    PLAINTIFF'S CONFIDENTIALITY AGREEMENTS

113.    When Ms. Blough was hired, she signed BCD's Confidentiality/Non-Solicitation Agreement ("Confidentiality Agreement") on or about February 6, 2012. (Blough Dep. (App. at ECF 70-2, p. 3), 22:5-16; 2012 Confidentiality Agreement, ECF 21-1, pp. 2-3; JSOF (ECF 69) ¶ 50).

114.    Ms. Blough understood that the Confidentiality Agreement required her to maintain BCD records and client information confidentially both during and after her employment. (Blough Dep. (App. at ECF 70-2, p. 3), 22:17-23; JSOF (ECF 69) ¶ 51).

115.    Section 2(b) of the Confidentiality Agreement defines "Confidential Information" to include:

> [A]ll information, documents, or facts pertaining to BCD Travel, without regard to form, which Employee has learned in the course of this Agreement and in discussions and proposals leading up to this Agreement. Confidential information also includes any information described in this paragraph that BCD Travel obtains from another party, including, but not limited to, its partners,

22

4898-3038-6272

suppliers, or vendors, and Restricted Clients and treats as proprietary or designates as confidential information, whether or not owned or developed by BCD Travel.

(JSOF (ECF 69) ¶ 52; 2012 Confidentiality Agreement, ECF 21-1, p. 2).

116.    Section 2(f) of the Confidentiality Agreement, likewise, defines "Trade Secrets," in relevant part, as:

[I]nformation in any form, including, but not limited to . . . sales history, profit margins . . . client proposals, internal communications . . . financial data (including sales and sales forecasts), and lists of actual or potential clients or vendors (including identifying information about such parties) which (i) derives economic value, actual or potential from being generally known to other persons who can derive economic value from the disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

(JSOF (ECF 69) ¶ 53; 2012 Confidentiality Agreement, ECF 21-1, p. 2).

117.    In consideration for training, and other good and valuable consideration by signing the Confidentiality Agreement, Ms. Blough agreed to comply with the terms of the Confidentiality Agreement, agreed to protect BCD's trade secrets, and agreed not to "directly or indirectly, (a) use or disclose any Confidential Information, other than for the benefit of BCD Travel" during her employment with BCD and for two (2) years thereafter." (2012 Confidentiality Agreement, ECF 21-1, p. 3; 2020 Confidentiality Agreement, ECF 15-1, p. 17, Section 3; 2021 Confidentiality Agreement, ECF 15-1, p. 29, Section 3; JSOF (ECF 69) ¶ 54).

118.    Similar to Ms. Blough's initial offer letter in 2012, Ms. Blough's 2018 offer letter for the Vice President, Global Sales position explained the terms and conditions of her new role, and how she was still bound by a Confidentiality/Non-Solicitation Agreement. (Offer Letter, ECF 21-2, p. 2; JSOF (ECF 69) ¶ 55).

23

4898-3038-6272

119.    On January 20, 2020, Ms. Blough executed a Sales Incentive Plan ("2020 Sales Incentive Plan"), which took effect on January 1, 2020. (2020 Sales Incentive Plan, ECF 15-1, pp. 7-18; JSOF (ECF 69) ¶ 56).

120.    The 2020 Sales Incentive Plan included a confidentiality and non-solicitation provision as well as attached a Confidentiality/Non-Solicitation Agreement, which Ms. Blough executed on March 30, 2020. (2020 Confidentiality Agreement, ECF 15-1, pp. 16-18, Section 3, ECF 15-1; JSOF (ECF 69) ¶ 57).

121.    By signing the 2020 Sales Incentive Plan, Ms. Blough acknowledged and agreed to be bound by the terms set forth in Section O of the Plan, which states as follows:

> Sales Staff recognize and acknowledge that lists of customers, prospects, methods of pricing, marketing, and other operations and sales activity are trade secrets, and as such, are valuable, special, and unique assets of BCD Travel. Accordingly, each Sales Staff member must execute, agree to be bound by BCD Travel's Confidentiality/Non-Solicitation Agreement to be eligible for participation in this Plan.

(2020 Sales Incentive Plan, ECF 15-1, p. 14; JSOF (ECF 69) ¶ 58).

122.    Ms. Blough executed a new Sales Incentive Plan and a Confidentiality Agreement on February 12, 2021, which was effective from January 1, 2021 through December 31, 2021. (2021 Sales Incentive Plan, ECF 15-1, pp. 19-30; JSOF (ECF 69) ¶ 59).

123.    By signing the 2021 Sales Incentive Plan, Ms. Blough acknowledged and agreed to be bound by Section M of the Plan which set forth the same confidentiality and non-solicitation terms and conditions as her 2020 Sales Incentive Plan. (2021 Sales Incentive Plan, ECF 15-1, p. 26; JSOF (ECF 69) ¶ 60).

124.    BCD entrusted Ms. Blough with trade secret, confidential, and/or proprietary business information, including, but not limited to the following: list of clients, list of prospective clients, client contact information, client sales histories, client pricing, BCD business marketing

4898-3038-6272

and sales strategies, client travel policies, and financial data. (Cruz Decl. (App. at ECF 70-5, p. 12), ¶ 69).

125.    BCD was asked to sign a non-disclosure agreement when it began to work on any response to a request for proposal. From Ms. Blough's experience, BCD "always got a mutual NDA in place whenever we were exchanging information," including BCD's pricing and offerings. (Blough Dep. (App. at ECF 70-2, p. 6), 46:8-19; JSOF (ECF 69) ¶ 61).

126.    Per the terms of the 2012 Confidentiality Agreement and the 2020 and 2021 Sales Incentive Plans (collectively referred to as "Confidentiality Agreements"), Ms. Blough was prohibited from using or disclosing confidential information except for the benefit of BCD during her employment and for two (2) years after her resignation and she was prohibited from disclosing BCD's trade secrets to the full extent provided by the law in Georgia. (2012 Confidentiality Agreement, ECF 21-1, p. 3; 2020 Confidentiality Agreement, ECF 15-1, p. 17, Section 3; 2021 Confidentiality Agreement, ECF 15-1, p. 29, Section 3; JSOF (ECF 69) ¶ 62).

127.    Louise Miller is a former BCD employee who was not employed by BCD in June or July 2021. (Cruz Decl. (App. at ECF 70-5, p. 12), ¶ 70).

128.    On June 21, 2023, Ms. Blough filed her Complaint ("Complaint") in the United States District for the Middle District of Pennsylvania, which contained the following information filed on the public docket:

    a.   Financial data of clients and potential clients, including the number of transactions for clients Halliburton and Boston Scientific (ECF 1, ¶ 32);

    b.   Names of clients and potential clients throughout (*See* ECF 1, ¶¶ 15, 17, 27-28, and 32); and

25

4898-3038-6272

    c.  The entire Sales Incentive Plans for 2020 and 2021, which contains competitive pricing information. (ECF 1, Exhibit B).

(Complaint, ECF 1; JSOF (ECF 69) ¶ 67).

129.    This information contains confidential and proprietary trade secret information. (Cruz Decl. (App. at ECF 70-5, p. 12, ¶ 71).

130.    In paragraph 28 of her Original Complaint, Ms. Blough identified the specific amount of commissions she could have earned had BCD been successful in its bids to provide travel services for Eli Lilly and Johnson & Johnson. She did so using the figures BCD included in its proposal to Eli Lilly and the estimated transactions BCD had in Salesforce from its last bid for Johnson & Johnson. (Blough Dep. (App. at ECF 70-2, p. 38), 131:13-23; Complaint, ECF 1, ¶ 28; JSOF (ECF 69) ¶ 68).

131.    Ms. Blough's Original Complaint was filed the Middle District's ECF system, which is available to the general public. (Complaint, ECF 1; JSOF (ECF 69) ¶ 69).

Dated: September 19, 2025          Respectfully submitted,

                                      /s/ Katelyn W. McCombs
                                      Mark T. Phillis (PA No. 66117)
                                      mphillis@littler.com
                                      Katelyn W. McCombs (PA No. 323746)
                                      kmccombs@littler.com

                                      LITTLER MENDELSON, P.C.
                                      One PPG Place, Suite 2400
                                      Pittsburgh, PA 15222
                                      PH: 412.201.7636 /7641
                                      FAX: 412.774.3756

                                      *Attorneys for Defendant*
                                      *BCD Travel USA LLC*

4898-3038-6272

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of September, 2025, a copy of the foregoing Defendant's Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment was filed using the Western District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

Kathryn L. Simpson
METTE, EVANS & WOODSIDE, P.C.
3401 N. Front Street
P.O. Box 5950
Harrisburg, PA 17110
klsimpson@mette.com

Gary D. Abrams
Gary D. Abrams & Associates, LTD
55 West Monroe Street
Telephone: 312.263.4085
Gda2164@gmail.com

/s/ Katelyn W. McCombs
Katelyn W. McCombs

4898-3038-6272