IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRUDY BLOUGH,<br><br>Plaintiff,<br><br>v.<br><br>BCD TRAVEL USA, LLC<br><br>Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Case No:  2:23-cv-01979-MPK<br><br><br><br>Jury Trial Demanded |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S CONCISE
STATEMENT OF MATERIAL FACTS**

Plaintiff, by her counsel, Mette, Evans & Woodside, files the following responses to the

Defendant's Concise Statement of Material Facts (ECF 73):

1.      Admitted this fact was included in the Joint Statement of Undisputed Facts

(DSOF ¶1; JSOF ¶1.).

2.      Admitted that BCD has an Equal Employment Opportunity/Affirmative Action

Policy; denied that it followed that Policy in dealing with Plaintiff's complaints.

3.      Admitted that BCD has a Harassment Policy; denied that it was applied or

enforced in Plaintiff's case; no corrective action was taken despite complaints.

4.      Admitted that Plaintiff acknowledged receipt of the Handbook.

5.      Admitted as generally accurate; immaterial to dispositive issues.

6.      Admitted as generally accurate; immaterial to dispositive issues.

7.      Admitted that team-selling occurred; denied that it was applied equitably.

Composition and leadership were used to marginalize Plaintiff's lead role on key bids.

1

8. Admitted in part/Denied in part. The paper criteria existed but were not applied neutrally; preferential assignments were made to male peers and to Mr. Cruz's spouse. While BCD articulates multiple "factors," the assignment process did not follow any consistent, objective standard in practice. Instead, assignments were made ad hoc and for the convenience of internal preferences and agendas. Mr. Cruz exercised unfettered discretion to pick and choose— diverting high-value opportunities to his spouse and male peers—while disregarding Ms. Blough's repeated requests to review and correct her inadequate pipeline. The cited "factors" were therefore not applied neutrally or uniformly to Ms. Blough (e.g., Cruz's prompt approval of Deb Cruz's ten-account list in July 2018, contrasted with his seven-month delay in approving Susan Altman's ten-account list despite multiple follow-ups, and the assignment of dormant or no-relationship accounts to Ms. Blough)

9. Admitted in part/Denied in part. The stated criteria do not explain patterns where O'Brien's high-value accounts and other major opportunities were diverted to males and Ms. Cruz while Plaintiff received none.

10. Admitted in part/Denied in part. While portions of the practice are accurate, it was not applied in 2021 when O'Brien's high-value accounts went to male colleagues and Deb Cruz, with none to Plaintiff.

11. Admitted.

12. Admitted in part / Denied in part. In Plaintiff's prior Regional Sales Director role under Rossana Martin, BCD followed a clear, neutral protocol: prospects were assigned based on geography and the location of the decision-maker/travel manager, and that protocol was applied consistently. Denied to the extent BCD suggests a uniform, objective methodology governed all assignments beyond the regional protocol. Outside the regional context, BCD did not adhere to

2

any set standard; assignments were made ad hoc for internal convenience and preferences, with Mr. Cruz exercising discretionary, convenience-based choices despite Plaintiff's repeated requests to review and correct her inadequate pipeline (as detailed in later paragraphs).

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Admitted.

17.    Admitted in part/Denied in part. Admitted that Plaintiff had not previously held BCD's Vice President, Global Sales title. Denied that she lacked relevant global-sales experience. While serving as Director, Regional Sales – Northeast under Rossana Martin, Plaintiff pursued and won multi-national opportunities for global companies year over year, coordinating across regions with global teams and managing those accounts to successful close. Her sustained performance—surpassing sales targets and earning BCD's Circle of Excellence recognition for three consecutive years leading up to her promotion—was the basis for her selection to the VP, Global Sales role. The statement that she had "no previous experience in global sales" is therefore misleading and overbroad; at most, she had not yet held BCD's internal VP title.

18.    Denied. BCD's decision to promote Plaintiff to Vice President, Global Sales is irreconcilable with the claim that she first needed to "develop her sales skills." There is no contemporaneous documentation of any such conversation—no email, memorandum, training plan, or performance-improvement plan—and no formal development plan was ever created or implemented for Ms. Blough. Immediately after the promotion, Mr. Cruz identified and placed in Plaintiff's portfolio what he characterized as global opportunities (many of which later proved

dormant or non-viable or were withheld/redirected). Even so, that contemporaneous designation reflects BCD's assessment at the time that Plaintiff could perform the role without any precondition. Mr. Cruz's litigation-era account is uncorroborated and inconsistent with BCD's own promotion and portfolio-assignment actions.

19.    Admitted in part/Denied in part. Admitted only that Mr. Cruz approved Plaintiff's promotion to Vice President, Global Sales. Denied that Plaintiff "lacked global sales experience" or required remedial development. In her Regional Sales Director role under Rossana Martin, Plaintiff originated and managed multi-national opportunities for global companies year-over-year, coordinated cross-region teams, exceeded sales targets, and earned BCD's Circle of Excellence three consecutive years leading up to the promotion, all of which formed the basis for selecting her for the VP role. There is no contemporaneous documentation of any pre-offer "skill-development" requirement (no email, memo, plan, or PIP), and immediately after promotion Mr. Cruz placed what he characterized as global opportunities in Plaintiff's portfolio (even if many later proved dormant), confirming BCD's view at the time that she could perform the role without preconditions. To the extent Defendant now relies on a purported "lack of global experience," it is litigation-driven spin inconsistent with BCD's promotion decision and portfolio assignments.

20.    Admitted.

21.    Admitted.

22.    Denied. Jorge Cruz instructed both Deb Cruz and Susan Altman to each transfer ten accounts to Plaintiff. Deb Cruz stated she was 'giving 10 of [her] more than 40 accounts,' which Jorge promptly approved in July 2018. He did not approve Altman's list until February 2019—despite multiple follow-ups from Altman in September 2018 (two emails) and again in

4

February 2019, and Plaintiff's repeated notices that many proposed accounts were nonviable based on Salesforce activity, lack of relationships, or geography. Plaintiff's pipeline remained effectively empty during this delay while male peers received commission-eligible opportunities.

23.     Admitted in part/Denied in part. Plaintiff received some additional prospects; however, the assertion that they were assigned "throughout the remainder of her employment" is misleading. Plaintiff's Salesforce pipeline did not materially change after 2019, and when high-value opportunities became vacant (e.g., after Mr. O'Brien's departure in 2021) they were reassigned to others; Defendant's own CSMF shows those accounts going to Sekhri, Maanicus, and Dewey, with the only new assignment to Plaintiff being Schlumberger on May 27, 2021. ECF 73 ¶¶ 62–66 (Schlumberger at ¶ 65).

24.     Admitted.

25.     Denied. The list BCD relies upon to claim that accounts and prospective clients were assigned "throughout Plaintiff's employment" is misleading and incomplete. The assignment dates provided by BCD do not align with when those opportunities were actually placed in Plaintiff's pipeline, nor is there any contemporaneous documentation to support the claimed timing. The list of "assigned" accounts included dormant or closed prospects, and most did not translate into viable, commission-eligible bids. Of the 24 accounts identified by Defendant, 21 are accounted for as follows:

8 transferred from Deb Cruz (per email exchange with Jorge Cruz, in which Ms. Cruz stated, "here are 10 of my 40 or so prospects that I have either not made any progress with, are in the tri-state area (NJ/NY/PA), and/or I don't feel like I had a good bond with, that I would like to consider giving up to be able to focus on the upper-end CT100 prospects in my pipeline");

6 transferred from Susan Altman (per email exchange with Jorge Cruz). After reviewing the assigned accounts in Salesforce, Plaintiff promptly raised concerns that the Altman transfers were not viable opportunities because they showed no active history, engagement, or revenue potential. Jorge Cruz acknowledged Plaintiff's email and replied that they would "discuss," but repeatedly postponed and never held that discussion; 4 were North America support-only opportunities where Plaintiff was not the lead; 2 were moved to the retention team; and 1 was transferred with Plaintiff's promotion.

These communications demonstrate that the accounts transferred to Plaintiff were selected because they were non-strategic, dormant, or low-potential, and that Plaintiff's documented concerns were ignored despite acknowledgment by leadership. There is no contemporaneous Salesforce or documentary evidence showing that any viable new accounts were subsequently assigned to Plaintiff. The record instead reflects that her pipeline remained stagnant while higher-value opportunities were reassigned to others.

26.    Admitted in part/Denied in part. While Plaintiff retained regional accounts, they were not comparable in scale or value to those distributed to Ms. Cruz and male peers; major global bids excluded Plaintiff while others received the opportunities.

27.    Admitted.

28.    Admitted.

29.    Admitted in part/Denied in part. While VPs were geographically dispersed, proximity was not applied consistently; accounts (e.g., GE, Bank of America, BAE, Goldman Sachs, and Mars) were assigned across regions contrary to the stated criterion.

30.     Denied. Menkes was not mere 'support' but an override of Plaintiff's leadership on UPS and BD; he reported to Janssen rather than to the assigned sales lead, creating a conflict of authority.

31.     Denied. Menkes operated at parity with VP-level leadership without quotas or commission accountability, undercutting Plaintiff's role and commissions.

32.     Admitted.

33.     Admitted in part/Denied in part. Admitted that BCD claims Andy Menkes was added to sales pursuits as a consultant to provide support and leverage his industry relationships. Denied that this was how his role functioned in practice for UPS and Becton Dickinson. In those opportunities, Mr. Cruz expressly instructed Plaintiff to yield to Mr. Menkes, making him the front person and strategic lead on the bids rather than a supporting consultant. Mr. Menkes directed client strategy and communications while Plaintiff was excluded from key decisions and stripped of authority to manage the process, contrary to BCD's stated "team-selling" protocol. This deviation from policy caused confusion internally and undermined Plaintiff's ability to control the opportunities, which were ultimately lost.

34.     Admitted.

35.     Denied. While BCD claims that Mr. Menkes merely "assisted" with the UPS bid, in reality Mr. Cruz instructed Plaintiff to yield to Mr. Menkes, effectively removing her as lead. Mr. Menkes reported directly to Michael Janssen, not to the sales organization or to Plaintiff, creating a conflict of authority within the bid team. Rather than providing limited consulting support, Mr. Menkes usurped Plaintiff's leadership role—he was inserted over her in strategy development, client-facing communications, and internal decision-making. His intervention derailed the established sales process, confused accountability, and undermined Plaintiff's ability

7

to manage the opportunity. The UPS bid was ultimately lost because Plaintiff's leadership was overridden and the chain of authority fractured.

36. Admitted. Menkes' prior 'relationship' was used as a pretext to justify his insertion; his involvement coincided with the opportunity's loss. Plaintiff's ability to control the outcome was removed when her lead role was taken; therefore the potential for a win and commission was lost.

37. Admitted.

38. Denied. BCD's assertion that Mr. Menkes merely "assisted" with the Becton Dickinson (BD) bid is inaccurate. Mr. Cruz directed Plaintiff to yield to Mr. Menkes on the BD opportunity, removing her authority as the global sales lead. Like UPS, this created a conflict of authority, because Mr. Menkes reported to Michael Janssen outside the sales chain and did not report to Plaintiff. Instead of providing limited consultative support, Mr. Menkes assumed control of strategy discussions and client communications, bypassing Plaintiff on key decisions. His involvement disrupted the coordinated sales process, delayed responses, and undermined team alignment, leading to a fractured approach and the eventual loss of the BD opportunity. Plaintiff's leadership was displaced and her ability to manage and control the bid was eliminated.

39. Admitted. Menkes' prior 'relationship' was used as a pretext to justify his insertion; his involvement coincided with the opportunity's loss. Plaintiff's ability to control the outcome was removed when her lead role was taken; therefore the potential for a win and commission was lost.

40. Admitted.

41. Denied. BCD's assertion that Mr. Menkes merely served as a "senior internal consultant" and that Plaintiff "remained the global sales lead" for UPS and Becton Dickinson

(BD) is misleading and contradicted by the record. BCD relied on Mr. Menkes's prior relationship with the clients as a pretext to justify his insertion into both pursuits. In practice, Mr. Cruz instructed Plaintiff to yield to Mr. Menkes, effectively removing her authority as lead. Internal and client communications identify Mr. Menkes as the strategy lead and client-facing representative, with Plaintiff excluded from critical meetings and decision-making. As with the Johnson & Johnson account under Kessie Bratko, this arrangement stripped Plaintiff of control, undermined her credibility, and derailed the coordinated sales process, causing her to lose command of opportunities that were central to her performance and compensation. The record therefore does not support BCD's claim that Plaintiff maintained leadership of the UPS and BD bids.

42.    Admitted in part/Denied in part. Admitted that Mr. Menkes was not personally eligible to receive commissions. Denied that his lack of commission eligibility negates the impact of his involvement. Although Mr. Menkes was not commission-eligible, his presence deprived Plaintiff of commissions by overriding her lead responsibilities. Acting under Mr. Cruz's instruction, Mr. Menkes became the front-facing strategy lead on both UPS and Becton Dickinson (BD), directing client strategy and communications while Plaintiff was sidelined. As a result, Plaintiff's ability to control outcomes on UPS and BD was removed when her lead role was taken; thus, the potential for wins and corresponding commissions was lost.

43.    Admitted in part/Denied in part. Admitted that Mr. Menkes was occasionally assigned to provide support to other sales leaders, including Rossana Martin and Deb Cruz, in connection with their prospecting efforts. Denied that those collaborations were comparable to his involvement on UPS and Becton Dickinson (BD). In Plaintiff's case, Mr. Cruz expressly instructed her to yield to Mr. Menkes, elevating him from a support resource to the front-facing

9

strategy lead with direct client interaction and decision-making authority. Internal and client communications confirm that Mr. Menkes was positioned as the primary contact and driver of strategy, a far greater level of control than he exercised on any other account. Both Ms. Martin and Ms. Cruz are identified on Plaintiff's witness list and are expected to testify regarding the nature and scope of Mr. Menkes's role on their accounts, which was limited to support and not leadership, underscoring the disparate treatment of Plaintiff's assignments.

44.    Admitted in part / Denied in part. Admitted that Mr. Menkes was assigned to provide limited support on certain other opportunities, including IBM, Credit Suisse, and Capital One. Denied that his role on those pursuits was comparable to his involvement with UPS and Becton Dickinson (BD). In those other accounts, the assigned sales leads maintained authority over the RFP process, led client presentations, and were not directed to yield to Mr. Menkes or present him as the client contact. Mr. Cruz instructed Plaintiff to yield to Mr. Menkes, who was presented internally and externally as the front person and strategic lead for both UPS and BD, directing communications and decisions that normally fell under the sales lead's purview. This deviation from standard protocol removed Plaintiff from control of the RFP process and from her direct client-presentation responsibilities.

45.    Denied. On Johnson & Johnson, Bratko's role was not 'support' but a full reassignment of leadership. Emails and IMs show the client and internal teams were told Bratko was leading and controlling strategy. Records confirm Plaintiff was excluded from client meetings, strategy calls, and communications, and was reprimanded by senior leadership when she merely responded to direct client outreach or shared approved marketing materials. Plaintiff's ability to control the outcome was eliminated when her lead role was taken; therefore the potential for a win and corresponding commission was lost.

10

46.    Denied. BCD's characterization that Ms. Bratko was simply "added to the sales team" for Eli Lilly is misleading and incomplete. Although Plaintiff was the assigned global sales lead, Mr. Cruz instructed her to follow Ms. Bratko's lead on strategy and client engagement, effectively making Ms. Bratko the de facto strategy lead. From the outset, Ms. Bratko stated that the client "wasn't going to change" and largely ignored the opportunity, withholding required content and approvals needed to advance the bid. When deliverables slipped, Ms. Bratko disparaged Plaintiff to senior leadership and blamed her for the delays, despite having failed to provide the materials necessary for submission. The pursuit was mishandled due to internal dysfunction and leadership's decision to elevate Ms. Bratko above Plaintiff, which undermined Plaintiff's authority, eroded team alignment, and caused the bid to fail. Plaintiff's ability to control the outcome was effectively removed through this undermining; thus, the potential for a win and corresponding commission was lost.

47.    Admitted in part/Denied in part. Admitted that the Eli Lilly bid closed as lost in February 2020. Denied that the loss resulted from market factors or client choice alone. The bid failed due to internal dysfunction and mismanagement after Mr. Cruz directed Plaintiff to follow Ms. Bratko's lead, elevating her to strategy control despite her own admission that the client "wasn't going to change." Ms. Bratko largely ignored the opportunity, withheld critical content and approvals, and later blamed Plaintiff for delays she caused. These actions deprived Plaintiff of her authority to lead the pursuit and of the opportunity to correct course. As a result, Plaintiff's ability to control the outcome was removed, and the potential win—and corresponding commission—was lost.

48.    Admitted in part/Denied in part. Admitted that Ms. Bratko was recognized internally for her knowledge of the pharmaceutical industry. Denied that her "subject-matter

11

expertise" justified displacing the assigned sales lead. Ms. Bratko was not a salesperson, had no sales quota or commission accountability, and was already managing existing pharmaceutical clients. Her insertion as the strategy lead on Johnson & Johnson and Eli Lilly violated the established sales hierarchy and removed Plaintiff's authority as the assigned lead. This deviation from BCD's standard sales structure caused confusion internally, undermined Plaintiff's credibility with the client teams, and contributed to the loss of both opportunities and their associated commissions.

49.    Admitted in part/Denied in part. Admitted that Ms. Bratko possessed pharmaceutical-industry experience and was added to the Johnson & Johnson pursuit. Denied that her role was limited to supporting strategy development or differentiation. Although initially described as a "pitch-team resource," Mr. Cruz instructed Plaintiff to follow Ms. Bratko's lead, making her the front-facing strategy lead and primary contact with the client. Internal and client communications show Ms. Bratko directing strategy, attending leadership calls in place of Plaintiff, and managing client discussions—activities well beyond the stated purpose of "helping BCD differentiate." This insertion removed Plaintiff from her leadership role, violated the sales hierarchy, and undermined her authority and credibility with both internal and client stakeholders. The resulting dysfunction contributed to the loss of the opportunity and Plaintiff's corresponding commission.

50.    Denied. Contrary to Defendant's assertion, Ms. Bratko was positioned as the sales lead on the Johnson & Johnson opportunity. Although Plaintiff was the originally assigned global sales lead, Mr. Cruz instructed her to follow Ms. Bratko's lead, effectively reversing the sales hierarchy and transferring authority to Ms. Bratko. Internal and client communications jointly issued by Mr. Cruz and Ms. Bratko identified her as the lead, including messages

circulated to global sales teams and client representatives confirming her leadership of the opportunity. Plaintiff was excluded from strategy meetings, client meetings, and account correspondence, confirming that Ms. Bratko—not Plaintiff—functioned as the front-facing strategy lead. This displacement undermined Plaintiff's authority, disrupted the standard sales process, and directly contributed to the loss of the opportunity and her corresponding commission.

51.    Admitted.

52.    Denied. While BCD may have intended for the process to operate as described, it undermined the sales process by excluding Plaintiff from the very strategic conversations and planning sessions that are essential to responding to an RFP. Plaintiff was not included in internal strategy discussions, client correspondence, or meetings where direction for the Johnson & Johnson pursuit was set. If BCD had truly intended for Plaintiff to serve as the global lead, she would have been involved in the emails, calls, and client engagements necessary to ensure RFP readiness and alignment. Instead, Mr. Cruz and Ms. Bratko conducted those communications without her, presenting Ms. Bratko as the lead and leaving Plaintiff without access to the information or authority needed to manage the opportunity. These actions undermined the standard sales process, excluded the assigned sales lead, and contributed to the lost opportunity and Plaintiff's corresponding commission.

53.    Admitted in part/Denied in part. Admitted that Plaintiff made repeated efforts to have constructive discussions with Mr. Cruz about her pipeline. Denied that those discussions were substantive or productive. The only consistent exchanges occurred during brief status-update "huddle" calls, many of which were canceled or rescheduled by Mr. Cruz. When Plaintiff attempted to raise concerns regarding the lack of viable opportunities and imbalance in her

13

pipeline, Mr. Cruz dismissed or deferred the conversations, promising to "discuss later" but failing to follow through. As a result, no meaningful or corrective discussions occurred, and Plaintiff's documented concerns about her inadequate pipeline remained unresolved throughout her tenure as Vice President, Global Sales.

54.     Denied. Mr. Cruz did not provide any such explanation of how accounts or new opportunities were assigned. When Plaintiff attempted to discuss the inequitable distribution of accounts and the lack of viable opportunities in her pipeline, Mr. Cruz repeatedly diverted the conversation, stating that he would "speak with Mike Janssen" and "right-set the pipeline," but he never did so and never followed up. No detailed discussion or clarification of assignment criteria, such as geography, experience, or client relationships,  ever occurred. Plaintiff's efforts to obtain transparency and correction were consistently dismissed, leaving her pipeline unchanged and her concerns unresolved.

55.     Admitted in part/Denied in part. Admitted that, like any commissioned salesperson, Plaintiff wanted a robust and balanced pipeline. Denied that her desire for more prospects reflected a routine request or dissatisfaction common among sales staff. Plaintiff's pipeline was materially inadequate compared to her peers and consisted largely of dormant, non-viable, or low-value accounts, a fact she repeatedly raised with Mr. Cruz and HR. Her efforts to address the imbalance were dismissed or deferred by leadership, leaving her without meaningful opportunities to generate commissions while similarly situated peers, including male VPs and Mr. Cruz's spouse, received active, revenue-generating assignments.

56.     Denied. Plaintiff's pipeline in late 2019 was not appropriate given her role, experience, and performance history. The accounts assigned to her were disproportionately low-value, dormant, or inactive, and did not reflect her skillset or revenue potential compared to

14

similarly situated peers. Plaintiff repeatedly raised concerns to Mr. Cruz that her pipeline lacked viable opportunities and was not aligned with her geography or expertise. Rather than address these concerns, Mr. Cruz acknowledged the imbalance and stated he would "right-set the pipeline" after speaking with Mike Janssen, but he never followed through. The record, including Plaintiff's email correspondence to Mr. Cruz, shows continued complaints about inadequate account assignments, not an "appropriate" pipeline as Defendant suggests.

57.    Denied. At no point during Plaintiff's tenure as Vice President, Global Sales was her pipeline "appropriate" for her experience, skillset, or geography. The accounts assigned to Plaintiff were disproportionately low-value, dormant, or inactive, and did not align with her record of performance or expertise. Plaintiff repeatedly raised these deficiencies to Jorge Cruz, who acknowledged the imbalance and stated he would "right-set the pipeline" after consulting with Mike Janssen, but he never did so and no corrective action was taken. Despite Plaintiff's continued requests for equitable account distribution, her portfolio remained stagnant while male peers and Deb Cruz—Mr. Cruz's spouse—received active, revenue-generating opportunities. Plaintiff's contemporaneous emails to HR and her discovery responses confirm ongoing complaints about her inadequate and non-competitive pipeline, directly contradicting Defendant's claim that it was "appropriate" throughout her employment.

58.    Admitted in part/Denied in part. Admitted that in approximately March 2021, Deb Cruz was reassigned from the Global Sales team to a newly created position within Media & Entertainment. Denied that this was a standard transfer or that it removed her from the sales organization. The position was not posted or competitively filled—it was created and awarded directly to Deb Cruz, and Jorge Cruz participated in that decision, along with Michael Janssen,

Mike Walley, and Michelle Lawley, as confirmed in Michael Janssen's deposition (Dep. Janssen 50:1-25).

59.  Denied. BCD's statement that Ms. Cruz's transfer "left several accounts unassigned" is misleading and inaccurate. While Mr. Cruz initially stated that he was unsure whether he would replace Deb Cruz on the Global Sales team, sales leads across the organization were instructed to transfer all of their media and entertainment accounts to Ms. Cruz following the announcement of her new role. In addition, Ms. Cruz was permitted to hand-pick which non-media accounts she would retain, contrary to BCD's claim that the accounts were unassigned or inactive.

60.  Admitted.

61.  Denied. Although BCD claims that Deb Cruz "never reported directly" to Jorge Cruz, the record demonstrates that Mr. Cruz exercised direct supervisory and strategic authority over her accounts throughout her tenure. While Ms. Cruz may have had only a "dotted-line" reporting relationship on paper in organizational charts for 2018 and was later removed from the structure in 2020, BCD's own documents show that Jorge Cruz remained the decision-maker on Ms. Cruz's portfolio and was actively engaged in her client strategy, account management, and presentations.

Numerous records produced by BCD confirm that Ms. Cruz reported to Jorge Cruz functionally through regular strategy sessions, presentation participation, and account planning on major clients, including:

61.  Denied. Although BCD claims Deb Cruz never reported directly to Jorge Cruz, he reviewed/approved her accounts and intervened in assignments and compensation; the marital relationship created an ongoing conflict that affected distribution of opportunities.

16

62.     Denied. BCD's assertion that Mr. O'Brien's accounts were reassigned based on proximity to the decisionmakers is false and contradicted by BCD's own records. As previously listed in Defendant's Summary Judgment filing, the Vice Presidents in Global Sales were located around the world—Susan Altman in Chicago, Deb Cruz in California, Vanessa Moore in Australia, Mark O'Brien in the United Kingdom, and Sachin Sekhri in New Jersey. Geography therefore could not have been a consistent or legitimate determining factor in account assignments.

The record shows that following Mr. O'Brien's termination in approximately March 2021, high-value global accounts were not distributed based on proximity, but rather reassigned to individuals favored by Jorge Cruz, including his spouse, Deb Cruz, and male peers such as Sachin Sekhri, Ton Maanicus, and Nick Dewey. Notably, Ton Maanicus and Nick Dewey were Regional Directors, positions below Plaintiff's Vice President title, yet they received multiple global accounts that were withheld from Plaintiff. Plaintiff, who was based in the United States and comparably situated, received none of these opportunities. This pattern demonstrates that BCD's purported reliance on "geographic proximity" was a pretextual justification for preferential treatment and is not supported by the evidence.

63.     Denied. While there were some inconsistencies within BCD's Salesforce records, the fact remains that Plaintiff did not receive any of the open accounts following Mr. O'Brien's departure. BCD's claim that the accounts were reassigned based on geographic proximity or specialized experience is unsupported by documentation and contradicted by its own global sales structure. Mr. O'Brien's position was eliminated due to redundancy, and therefore there was no

17

justification for holding back accounts under the pretense of preserving pipeline for a replacement Global Sales Lead—none was hired.

The record demonstrates that Jorge Cruz deliberately withheld assignments to retain control over the pipeline and restrict Plaintiff's access to viable opportunities. His repeated deferrals and non-responsiveness to Plaintiff's requests for equitable distribution suggest an effort to limit her portfolio while awaiting what he perceived as a "better option" for placement of key accounts—or to observe whether the constructive discharge he was orchestrating would force Plaintiff to resign. During this period, high-value opportunities previously linked to Mr. O'Brien were instead diverted to favored employees, including Deb Cruz (his spouse) and male counterparts, such as Sachin Sekhri, Ton Maanicus, and Nick Dewey—the latter two being Regional Directors below Plaintiff's title. Plaintiff, who was comparably qualified and positioned within the United States, received none of those accounts.

64.    Admitted that Plaintiff had no prior relationship with certain O'Brien accounts; denied that this justified excluding her; recipients also lacked prior ties yet received those accounts.

65.    Denied. Assignment to Schlumberger after O'Brien's departure produced no new revenue opportunity and merely created the appearance of balance as Plaintiff was listed as the North America support for this account.

66.    Denied. BCD's assertion that a portion of Mr. O'Brien's accounts was "kept intact for future employees" is false and contradicted by the record. Mr. O'Brien's position was eliminated due to redundancy, and BCD did not hire or identify any replacement for his role within Global Sales. Therefore, there was no legitimate reason to withhold accounts under the guise of preserving pipeline for a future hire. In practice, the decision to keep those accounts

18

"unassigned" served only to allow Jorge Cruz to control the redistribution of opportunities and to continue withholding viable prospects from Plaintiff.

68.    Admitted in part/Denied in part. Admitted that the Sales Incentive Plans (SIPs) included a provision stating that commissions would not be paid until a fully executed customer contract was in place during the first six months of ticketing. Denied to the extent Defendant implies that this provision barred payment of Plaintiff's commissions. The Halliburton contract was fully executed, satisfying the condition precedent for payment, yet Plaintiff's earned commissions were withheld in violation of the plan terms. Accordingly, the cited provision is immaterial to Plaintiff's claim for unpaid commissions.

69.    Admitted.

70.    Admitted.

71.    Admitted.

72.    Denied. The claimed 'deferral to benefit employees' lacked any guarantee of later payment to those constructively discharged; for Plaintiff, it erased earned income.

73.    Denied. The shifted earning window advantaged only active employees; Plaintiff's constructive discharge rendered her ineligible for reinstatement of commissions that should have been paid.

74.    Denied. No accounting or adjustment was made for those separated during the freeze; Plaintiff's earnings remained withheld.

75.    Denied. Plaintiff did not agree to permanent forfeiture of commissions; she acknowledged notices but did not waive entitlement to earned compensation and pursued payment through counsel.

76.     Denied. The freeze remained through her separation and was lifted later; others received reinstated payments including amounts accrued during the freeze; Plaintiff did not.

77.     Admitted that the freeze remained through resignation; denied that withholding post-freeze payment of earned commissions was lawful.

78.     Admitted.

79.     Admitted in part/Denied in part. Admitted that the Boston Scientific contract was executed on April 25, 2022, after Plaintiff's resignation. Denied to the extent Defendant implies that Plaintiff was not entitled to the related commission. Plaintiff was the assigned sales lead, directed and managed the pursuit, and completed the work necessary to secure the client's commitment prior to her constructive discharge. Because BCD's conduct forced her resignation, Plaintiff was compelled to walk away from earnings she had already generated through her leadership of the opportunity. Under the circumstances of constructive discharge, Plaintiff should have been compensated for commissions earned prior to her forced departure, and BCD's failure to do so constitutes improper withholding of earned wages.

80.     Admitted in part/Denied in part. Admitted that in February 2019, during a leadership event, Plaintiff spoke with Kathy Jackson, then Executive Vice President, Global Program Management, and raised concerns about her treatment in the Vice President, Global Sales role. Denied that the conversation was limited to general "work concerns." In that discussion, Plaintiff specifically expressed concerns regarding unequal treatment, inequitable account distribution, and the stress and anxiety caused by management's actions. Ms. Jackson acknowledged the seriousness of the issue and cautioned Plaintiff that "you don't cross the Cruzes," referring to Jorge and Deb Cruz, signaling that raising further concerns could

20

jeopardize Plaintiff's position. This exchange reflects both the culture of favoritism within BCD and the implicit warning that discouraged Plaintiff from pursuing a formal complaint at that time.

81. Admitted in part/Denied in part. Admitted that Plaintiff spoke with Kathy Jackson about her concerns regarding Mr. Cruz's lack of responsiveness to her repeated efforts to address deficiencies in her pipeline. Denied that Plaintiff stated she was "not being respected in the Vice President, Global Sales role." Plaintiff expressed that she was not being taken seriously, that her concerns were being dismissed, and that leadership was not listening or taking corrective action. She also described feeling uncomfortable with the dynamics between herself and her counterpart, Deb Cruz, given Deb's relationship to Mr. Cruz and the clear imbalance in how opportunities and support were distributed. Things did not seem fair, and Plaintiff noted that even obtaining internal resources or cross-functional assistance was difficult when those same resources were needed by Deb Cruz, who was consistently prioritized. The substance of the conversation centered on Plaintiff's frustration that her professional input and efforts were disregarded and that she was being marginalized within the sales organization.

82. Cannot confirm nor deny. Plaintiff cannot confirm or deny this statement, as it is based solely on Yvette Bryant's declaration, which was not made under oath or contemporaneously with the events described, and instead reflects BCD's internal narrative prepared for litigation. Plaintiff has no independent knowledge of what Ms. Jackson may have communicated to Ms. Bryant, and no supporting documentation or contemporaneous record has been produced. To the extent this statement relies on Ms. Bryant's unsworn declaration, it should be afforded little evidentiary weight.

83. Cannot confirm nor deny. Plaintiff cannot confirm or deny this statement, as it is derived solely from Yvette Bryant's declaration, which was not sworn under oath or

21

contemporaneous with the events described and reflects BCD's litigation-driven narrative rather than an objective record. Plaintiff has no independent knowledge of what Ms. Bryant may have communicated to Ms. Jackson, and Defendant has produced no contemporaneous emails, notes, or documentation to substantiate this claim. Accordingly, any assertion based on Ms. Bryant's unsworn declaration should be afforded little evidentiary weight.

84.     Cannot confirm nor deny. Plaintiff cannot confirm or deny this statement, as it is based solely on Yvette Bryant's declaration, which was not sworn under oath or made contemporaneously with the events described and reflects BCD's internal narrative prepared for litigation. Plaintiff has no recollection of receiving such an email, and Defendant has not produced a contemporaneous, authenticated copy to substantiate that the communication occurred.

85.     Denied. Plaintiff's recollection of the conversation with Yvette Bryant differs from Defendant's account. Ms. Bryant's description is based on an unsworn declaration prepared for litigation and should be afforded little evidentiary weight. Plaintiff recalls that during their discussion, she felt pressured to make statements favorable to BCD and was uncomfortable with the conversation. Aware of another discrimination case involving a co-worker and Kathy Jackson's prior warning that "you don't cross the Cruzes," Plaintiff feared that escalating her concerns would jeopardize her job or worsen the environment. Ms. Bryant gave Plaintiff a "choice"—either Plaintiff could speak to Jorge Cruz directly, or Ms. Bryant would do so on her behalf. This "choice" made clear that BCD's preference was to keep the matter internal and informal, and it effectively ended HR's involvement, leaving Plaintiff without any neutral support or meaningful avenue for resolution.

22

86.    Admitted in part/Denied in part. Admitted that Plaintiff recalls stating she would speak directly with Jorge Cruz regarding her concerns. Denied that this conversation occurred in the manner or context described by Defendant. Ms. Bryant's version of events is based on an unsworn declaration prepared for litigation and should be afforded little evidentiary weight. Plaintiff recalls being given a "choice" by Ms. Bryant, either she could raise the issue with Mr. Cruz herself or Ms. Bryant would do so on her behalf. Plaintiff chose to speak with Mr. Cruz directly, hoping for resolution, but this was done under pressure and discomfort, as Ms. Bryant's response made clear that formal HR involvement was not encouraged.

87.    Denied. Ms. Bryant's statement is based on an unsworn declaration prepared for litigation and should be afforded little evidentiary weight. Plaintiff disputes Defendant's characterization of her conversation with Ms. Bryant. During that discussion, Plaintiff described being excluded from opportunities, ignored by leadership, and publicly embarrassed in front of senior executives—conduct that constitutes hostile treatment even if the term "hostile work environment" was not expressly used. These events occurred prior to the Johnson & Johnson, Becton Dickinson, and UPS incidents that Mr. Cruz later orchestrated, establishing that Plaintiff's concerns about unfair and retaliatory behavior began well before those accounts were reassigned. Plaintiff's complaint to Ms. Bryant included favoritism, exclusion from key accounts, and inequitable treatment, but Defendant's summary omits these central points.

88.    Cannot confirm nor deny. Plaintiff does not specifically recall this communication.

89.    Cannot confirm nor deny. Plaintiff does not specifically recall this communication.

90.     Cannot confirm nor deny. Plaintiff does not specifically recall this communication.

91.     Admitted in part/ Denied in part. Admitted that Plaintiff sent an email to Ms. Bryant including the phrase "we are all good." Denied that this statement reflected genuine resolution of Plaintiff's concerns or satisfaction with the outcome. Plaintiff sent the message in an effort to de-escalate the situation after repeated cancellations and lack of response from Mr. Cruz, and to avoid further hostility or retaliation within the organization. The phrase was intended to conclude the exchange diplomatically, not to suggest that the underlying issues— unequal treatment, exclusion, and lack of support—had been addressed or resolved. Plaintiff's contemporaneous circumstances, including fear of retaliation and feeling isolated by leadership, explain the conciliatory tone of the message, which was a professional attempt to move forward rather than an indication of agreement with BCD's conduct.

92.     Denied. This characterization is inaccurate and based solely on Ms. Bryant's unsworn declaration, which was not made under oath or contemporaneous with the events described and reflects BCD's litigation narrative. Plaintiff's conversation with Ms. Bryant included her concerns about unequal treatment, exclusion, lack of support, and favoritism within leadership, all of which constitute hostile and discriminatory conduct even if the precise legal terms "sex discrimination" or "hostile work environment" were not used. Plaintiff also described feeling dismissed and isolated, with her concerns being minimized or ignored by Mr. Cruz. Her reluctance to label the conduct explicitly as "discrimination" stemmed from fear of retaliation and Kathy Jackson's prior warning that "you don't cross the Cruzes." The absence of formal terminology does not negate that Plaintiff raised the underlying issues of bias, hostility, and unfair treatment to HR.

24

93.    Denied. This statement is inaccurate and relies solely on Ms. Bryant's unsworn declaration, which was not made under oath or contemporaneously with the events described and reflects BCD's litigation narrative. Plaintiff did not continue raising concerns with Ms. Bryant because it was clear that leadership turned a blind eye to Jorge Cruz's management style, despite prior issues raised by other employees, and continued to enable the nepotism between Jorge and Deb Cruz. The company's repeated accommodations of their arrangement and willingness to appease Deb Cruz's preferences made it apparent that HR and leadership would not act impartially. Under those circumstances, Plaintiff saw little use in escalating her complaints further, as doing so would have only increased her fear of retaliation and further isolation.

94.    Admitted.

95.    Admitted in part/Denied in part. Admitted that during the October 13, 2021 phone call with Jorge Cruz, Plaintiff stated that she had been "trying to get him to right-set [her] pipeline for years," that she did not feel respected or valued, and that she was embarrassed by the way he treated her and handled opportunities. Denied that these were the only reasons she gave for her resignation.

Mr. Cruz attempted to cancel the call, but Plaintiff insisted on speaking with him because she needed to express that her situation had become unbearable. Plaintiff explained that over the prior three years, she had repeatedly challenged the viability of her pipeline, raising it on every call and asking for equitable assignments following Mark O'Brien's departure and Deb Cruz's promotion. She told Mr. Cruz that she had not received a new RFP in more than two years, despite consistent efforts and proven success, and that he had not made any effort to provide work commensurate with the position for which he had promoted her.

25

Plaintiff also told Mr. Cruz that she did not feel empowered in her role and that she was continually instructed to yield to others, including Kessie, Lisa McKenzie, and Andy Menkes, which left her sidelined and undermined. She emphasized that there was no lack of confidence shared with her at any time from when she was promoted from the time she was promoted to Vice President through that day, and that the repeated interference by Andy Menkes, in particular, was demoralizing and destructive to her authority. Plaintiff stated that she had been a loyal employee for nearly a decade, had never been placed on any performance counseling, and had always sought to resolve issues directly and professionally.

During the call, Mr. Cruz agreed and said he understood where she was coming from and that "it wasn't intentional," effectively acknowledging her concerns but offering no resolution. The call reflected the culmination of years of unaddressed inequities, loss of authority, and professional humiliation—constituting constructive discharge, not a voluntary resignation.

96.    Admitted.

97.    Admitted.

98.    Denied. Plaintiff disputes that Ursula Dvorkin conducted a prompt or impartial investigation. To date, Defendant has produced no contemporaneous investigation file (e.g., witness lists, interview notes, emails/Teams messages, document-review logs, or findings memorandum). There is likewise no evidence that Ms. Dvorkin interviewed key witnesses (e.g., Altman, Martin, Bratko, Deb Cruz) or reviewed core records (Salesforce histories, IMs, and emails) before concluding "no unfair treatment." The HR accounts provided by Yvette Bryant and Ursula Dvorkin are unsworn, post-hoc narratives prepared for litigation, not contemporaneous records, and they omit Plaintiff's repeated reports of unequal treatment, exclusion, and favoritism. Without contemporaneous notes, interview summaries, or supporting

26

documentation, there is no reliable basis to conclude a legitimate investigation occurred or to afford those narratives significant weight under Rule 56(c)(4).99. Denied. Plaintiff reiterated inequitable treatment, non-strategic assignments, and humiliation by leadership; HR notes omitted those details.

99.    Admitted in part/Denied in part. Admitted that on October 15, 2021, Plaintiff spoke with Ursula Dvorkin following her resignation email. Denied that Plaintiff "once again focused on the inadequacy of her pipeline" as if that were the sole or primary subject. The assertion that Plaintiff never alleged unfair treatment is false; HR narrowed the inquiry to 'pipeline concerns' and ignored context. In that conversation, Plaintiff reiterated exactly what she told Mr. Cruz and what she wrote in her resignation—no more and no less: years of unequal treatment and exclusion, the loss of authority/empowerment (including being told to yield to others), the absence of work commensurate with the VP role, and the stress and humiliation caused by leadership's handling of opportunities—along with the inadequate pipeline. Ms. Dvorkin's contrary framing relies on an unsworn, litigation-prepared account rather than contemporaneous, documented findings; no neutral investigation file (notes, witness interviews, or record review) has been produced to support her characterization.

100.    Denied. Plaintiff disputes this characterization. The statement relies solely on Ms. Dvorkin's unsworn, litigation-prepared declaration, which was not made under oath or contemporaneously with the events and omits key portions of their discussion. During the October 15, 2021 conversation, Plaintiff reiterated the same concerns she expressed to Mr. Cruz and in her resignation email—nepotism, favoritism, exclusion from key opportunities, loss of authority, and ongoing humiliation under Mr. Cruz's leadership and the disrespectful treatment she received from other senior leaders, including being undermined and ignored in meetings and

communications. Those complaints inherently described discriminatory and hostile conduct, even if Plaintiff did not use formal legal terminology such as "gender discrimination" or "hostile work environment." Plaintiff's concerns about Mr. Cruz's treatment of her, the preferential accommodation of his spouse, Deb Cruz, and the enabling conduct of other senior executives directly reflect the discriminatory and retaliatory conditions that led to her constructive discharge.

101.    Denied. Plaintiff disputes this characterization. The statement is based solely on Ms. Dvorkin's unsworn, litigation-prepared declaration, which omits the full scope of Plaintiff's statements and concerns. During the October 15, 2021 discussion, Plaintiff expressed that she had been denied the opportunity to earn commissions because she was repeatedly excluded from viable accounts and new RFPs, and that she was deprived of revenue-producing opportunities consistent with her Vice President role. Plaintiff's complaint centered on the loss of commission-eligible work, not on a base-salary disparity, and she made clear that her compensation had been adversely impacted by the inequitable distribution of accounts and leadership's failure to "right-set" her pipeline. To the extent Defendant suggests otherwise, it misrepresents the substance of Plaintiff's complaint and the basis for her claim of unequal treatment and constructive discharge.

102.    Denied. This statement is based solely on Ms. Dvorkin's unsworn, litigation-prepared declaration, which was not made under oath or contemporaneous with the events described, and it does not accurately reflect the full scope of Plaintiff's statements. During her conversation with Ms. Dvorkin, Plaintiff followed the same script she used in her resignation call with Jorge Cruz and her follow-up email—no more and no less. Plaintiff reiterated that from the time she started in the Global Sales Vice President role, she had been denied meaningful and strategic accounts, that her pipeline was inadequate, and that she had lost authority,

28

empowerment, and access to viable opportunities. Plaintiff described the demoralizing impact of ongoing interference, exclusion, and inequitable treatment, all of which reflected the same concerns she had repeatedly raised over the prior three years. Ms. Dvorkin's summary omits this context and should be afforded little evidentiary weight.

103.   Denied. This characterization is incomplete and misleading and is drawn solely from Ms. Dvorkin's unsworn, litigation-prepared declaration, which omits the full scope of Plaintiff's concerns and experiences. Plaintiff did not merely report feeling "embarrassed on several calls." She explained that she was consistently undermined, ignored, and humiliated by Jorge Cruz, who frequently dismissed her input and, on one occasion, publicly embarrassed her during a leadership dinner in front of other executives. Plaintiff also described Kessie Bratko's mean-spirited and unprofessional conduct, including demeaning comments, gossiping with Lisa McKenzie, and spreading disparaging remarks to other senior leaders that damaged Plaintiff's professional reputation. Additionally, Andy Menkes exhibited condescending behavior, going to leadership behind Plaintiff's back to shift blame and take credit for her work. Collectively, these actions created a toxic and humiliating environment that eroded Plaintiff's authority, damaged her credibility with peers and leadership, and contributed directly to the stress and loss of confidence that culminated in her constructive discharge.

104.   Admitted in part/Denied in part. Admitted that Plaintiff discussed the lack of viable accounts in her pipeline and referenced that none of Mark O'Brien's former accounts were reassigned to her following his termination, and that Deb Cruz retained non-media accounts after her transfer to the Media & Entertainment division. Denied that Plaintiff's comments were limited to "how she felt" or mere personal opinion. Plaintiff's statements were based on objective facts supported by internal records showing that Mr. O'Brien's accounts were

redistributed to others—including male subordinates and Deb Cruz—while Plaintiff, despite her tenure and title, received none of them. She further explained that this pattern demonstrated ongoing favoritism, exclusion, and lack of transparency in account assignments. This statement is drawn solely from Ms. Dvorkin's unsworn, litigation-prepared declaration, which omits that Plaintiff's examples were presented as evidence of systemic inequity, not as isolated feelings.

105.    Denied. This conversation did not occur as described. The statement is based solely on Ms. Dvorkin's unsworn, litigation-prepared declaration, which was not made under oath or contemporaneously with the events described and reflects BCD's narrative rather than an objective account. Plaintiff did not provide "several examples" as alleged; instead, she reiterated the same statements she made during her resignation call with Jorge Cruz and in her follow-up email—no more and no less. Plaintiff restated that she had been denied equitable opportunities, that her pipeline had been stagnant for years, and that the conditions of exclusion and favoritism had become unbearable, leaving her no choice but to resign. Ms. Dvorkin's description mischaracterizes the discussion and omits that Plaintiff's statements were consistent with her constructive discharge explanation, not a new or expanded account of her concerns.

106.    Denied. This characterization is inaccurate and based solely on Ms. Dvorkin's unsworn, litigation-prepared declaration, which was not made under oath or contemporaneous with the events described. Plaintiff did not "simply complain" about account assignments; she reiterated the same concerns expressed in her resignation call with Jorge Cruz and in her follow-up email—that her pipeline had been stagnant for years, that no meaningful or strategic accounts were reassigned to her following Mark O'Brien's termination and Deb Cruz's transfer, and that leadership had repeatedly ignored her requests to "right-set" her pipeline. Plaintiff emphasized that these omissions were part of a broader pattern of exclusion, inequitable treatment, and loss

of authority that made her position untenable. Ms. Dvorkin's summary omits this context and should be afforded little evidentiary weight.

107.    Denied. This statement is based solely on Ms. Dvorkin's unsworn, litigation-prepared declaration, which was not made under oath or contemporaneous with the events described. The explanation attributed to Mr. Cruz—that account reassignments were made "based on geographic proximity to the client and decisionmaker"—is contradicted by BCD's own records and prior filings showing that Vice Presidents of Global Sales were located across multiple continents, and that geography was not a consistent or determining factor in account assignments. The reassignment of Mark O'Brien's accounts to individuals such as Deb Cruz (California), Sachin Sekhri (New Jersey), Ton Maanicus (Belgium), and Nick Dewey (United Kingdom)—while none were given to Plaintiff, who was based in the United States—demonstrates that proximity was a pretext used to justify favoritism and inequitable distribution. Ms. Dvorkin's account omits this context and should be afforded little evidentiary weight.

108.    Denied. Plaintiff disputes this statement as inaccurate and misleading. The claim that Mark O'Brien's accounts were reassigned based on geographic proximity is contradicted by BCD's own records and filings, which show that the Vice Presidents of Global Sales were located around the world—including Susan Altman (Chicago), Deb Cruz (California), Vanessa Moore (Australia), Mark O'Brien (United Kingdom), and Sachin Sekhri (New Jersey). Thus, geography could not have been a consistent or controlling factor in reassigning accounts. The record demonstrates that after Mr. O'Brien's termination, high-value global accounts were distributed to preferred employees, including Deb Cruz, Sachin Sekhri, Ton Maanicus, and Nick Dewey, while Plaintiff—who was equally qualified and located in the United States—received

none. The geographic proximity rationale was therefore a pretextual explanation used to justify favoritism and the continued exclusion of Plaintiff from viable revenue-generating opportunities.

109. Denied. This conclusion is drawn solely from Ms. Dvorkin's unsworn, litigation-prepared declaration, which was not made under oath or contemporaneous with the events described and is unsupported by any contemporaneous investigation file or documentation. Plaintiff disputes that Ms. Dvorkin conducted any legitimate or impartial review of the information provided. No witnesses were interviewed, no relevant communications or Salesforce data were reviewed, and no written findings were shared with Plaintiff. Ms. Dvorkin's claimed "conclusion" ignores the substance of Plaintiff's resignation call and follow-up email, in which she reported favoritism, exclusion, humiliation, and loss of authority under Mr. Cruz's leadership. Without contemporaneous notes or supporting evidence, there is no credible basis for Ms. Dvorkin's assertion that Plaintiff was treated fairly or that any genuine investigation occurred.

110. Admitted.

111. Admitted.

112. Admitted.

113. Admitted.

114. Admitted.

115. Admitted.

116. Admitted.

117. Admitted.

118. Admitted.

119. Admitted.

120. Admitted.

121. Admitted.

122. Admitted.

123. Admitted.

124. Admitted.

125. Admitted.

126. Admitted.

127. Admitted.

128. Admitted in part/Denied in part. Admitted that Plaintiff's Complaint, filed on June 21, 2023 in the United States District Court for the Middle District of Pennsylvania, contained references to client names, transaction figures, and excerpts from the 2020 and 2021 Sales Incentive Plans. Denied that any of this information constituted the improper disclosure of confidential or proprietary data. The information cited was lawfully obtained and already available within the public domain, including from prior court filings, industry publications, and documents produced by Defendant during discovery. The inclusion of this material was necessary to identify comparators and establish the factual basis of Plaintiff's claims, and all such references were filed on the public docket in accordance with federal court procedure. Plaintiff's use of evidence is protected under Rule 26 and the Federal Rules. She has not used or disclosed information outside this proceeding; client references are public or necessary to prove discrimination, retaliation, and constructive discharge. BCD's contrary characterization is baseless and retaliatory.

129. Denied. Plaintiff disputes that the information referenced in her Complaint constitutes confidential or proprietary trade secret information. The data cited—including client

names, transaction figures, and excerpts from the 2020 and 2021 Sales Incentive Plans—was lawfully obtained from Defendant's own filings and publicly available sources within the public domain at the time of filing. Much of this information had already been produced or disclosed by BCD in prior litigation filings, discovery materials, or industry publications such as Business Travel News. Plaintiff's inclusion of these materials was made in good faith and in accordance with court procedures to support her claims and does not constitute any unauthorized use or disclosure of confidential or trade secret information.

130.    Admitted in part/Denied in part. Admitted that Plaintiff's Original Complaint included a reference to the estimated commissions she could have earned had BCD been successful in its bids for Eli Lilly and Johnson & Johnson. Denied that any improper or confidential information was disclosed. The figures cited were based on data lawfully available through BCD's own bid materials and Salesforce summaries previously disclosed in discovery and within the public record, and were used solely to illustrate the scope of Plaintiff's lost earning potential. Plaintiff's inclusion of those estimates was a good-faith effort to quantify damages arising from the loss of those opportunities and does not constitute any misuse or disclosure of confidential or proprietary information.

131.    Admitted.

Respectfully submitted,

METTE, EVANS & WOODSIDE

/s/ *Kathryn L. Simpson*
KATHRYN L. SIMPSON, ESQUIRE
Sup. Ct. I.D. No.  28960
3401 North Front Street
P. O. Box 5950
Harrisburg, PA  17110-0950
(717) 232-5000 - Phone
(717) 236-1816 – Fax

October 17, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17 day of October, 2025, the foregoing document was filed using the Western District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, upon all counsel of record.

Respectfully submitted,

METTE, EVANS & WOODSIDE

By:     *Kathryn L. Simpson*
        KATHRYN L. SIMPSON, ESQUIRE
        Sup. Ct. I.D. No.  28960
        3401 North Front Street
        P. O. Box 5950
        Harrisburg, PA  17110-0950
        (717) 232-5000 - Phone
        (717) 236-1816 - Fax

        Attorneys for Plaintiff

Date:   October 17, 2025

3460352v1