IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRUDY BLOUGH, | : | Civil Action No: 2:23-cv-01979 |
| | : | Magistrate Judge Maureen P. Kelly |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BCD TRAVEL USA, LLC | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant BCD Travel USA, LLC ("BCD") has moved for summary judgment on each of

Plaintiff Trudy Blough's claims of Gender Discrimination in Violation of Title VII (Count I),

Hostile Work Environment in Violation of Title VII (Count II), Breach of Contract (Count III),

and Violation of the Equal Pay Act (Count IV).  Ms. Blough respectfully resists this Motion and

asks this Court to deny the Motion as the record is replete with evidence creating genuine disputes

of material fact that must be resolved by a jury.

Over the course of nearly a decade of dedicated employment, Ms. Blough rose through the

ranks of BCD from Regional Director to Vice President of Global Sales. Despite her repeated top-

tier performance and receipt of BCD's "Circle of Excellence" award, her direct supervisor, Jorge

Cruz, systematically denied her equal opportunities as a Vice President to compete for lucrative

1

global accounts, assigning open opportunities to male colleagues (including the of lower rank) and his wife, and ignored Ms. Blough's repeated pleas to correct the inequities.

The evidence, including contemporaneous emails, instant messages, deposition testimony, and BCD's own documents, shows that BCD, through Mr. Cruz, distributed premier accounts to Ms. Blough's male colleagues and to Mr. Cruz's wife, directed Ms. Blough to yield control of high-value prospects to non-sales personnel, and ignored her complaints to BCD's human resources personnel of discriminatory conduct. Viewed in the light most favorable to the Plaintiff who is the non-moving party here, the record supports findings that Ms. Blough's case alleging gender bias and discrimination against her based on her sex, that she was subjected to a hostile environment, that BCD's purported reasons for its actions are pretextual, and that Ms. Blough was constructively discharged should go forward. Accordingly, BCD's motion for summary judgment must be denied.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Third Circuit has held that "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only "when the moving party has carried its burden under Rule 56(c), its opponent must

do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. *Matreale v. N.J. Dep't of Military & Veterans Affairs*, 487 F.3d 150, 152 (3d Cir. 2007).

## III.    COUNTER-STATEMENT OF FACTS

Plaintiff is Trudy Blough, an employee of Defendant BCD Travel USA, LLC ("BCD") from February 6, 2012 until she was constructively discharged on October 14, 2021. (ECF 15, Amended Complaint ¶ 9; ((Blough Dep.) Ex. A, 152 l.21-25; 153 l. 1-25; 15 l. 1). Ms. Blough worked as a Director of Regional Sales and was promoted to Vice President, Global Sales on or about July 9, 2018. (ECF 69, JSUF ¶8). In that role, she reported to Jorge Cruz. Mr. Cruz was BCD's Executive Vice President of Global Sales and Marketing. (ECF 18, Defendant's Answer, ¶ 10).

Sachin Sakhri (male) and Deborah Cruz, Mr. Cruz's wife, were among those supervised by Mr. Cruz. (Ex. B)[1]. Mr. Sakhri and Ms. Cruz received more favorable assignments that did Ms. Blough. (ECF ¶ 15; Ex. A, 79 l. 9-16). Males within BCS, including those with lesser titles, were favored in assignments over Ms. Blough. (ECF 14 at ¶ 14). Additionally, Mr. Cruz caused Ms. Blough to relinquish her leadership role on the BD and UPS accounts to Andy Menkes endangering

---

[1] While BCD denies that Mr. Cruz supervised his wife, Debra Cruz, the global sales and marketing organizational chart produced in discovery by BCD (Ex. B) reflects that Ms. Cruz reported to her husband in 2019 ((Cruz Dep.) Ex. C, 63 l. 10-20). Mr. Cruz benefitted from his efforts to provide Ms. Cruz with favorable accounts as the couple shared income as evidenced by their filing of joint tax returns. *Id.* 86 l. 10-12.

the opportunities which eventually led to the loss of those opportunities.  Mr. Cruz, in doing so, told Ms. Blough that Mr. Menkes would be "client facing" on those accounts. (Ex. A, 96. l. 16-19; 97, l. 4-25; 98, l. 1-23).

Ms. Cruz became VP of Sales and Marketing for Entertainment in early 2021.  (ECF 14 at ¶ 16).  She remained lead for the accounts she left behind which entitled her to receive a commission on those accounts if BCD won the business. *Id.* at ¶ 17.

Ms. Blough asked that Mr. Cruz address the practice of favoring male co-workers which he promised to do but no action was ever taken.  *Id.* at ¶ 21.

Ms. Blough and Kathy Jackson, BCD's Vice President of Executive Chair Sustainability spoke about the hostile work environment in 2019. (*Id.* at ¶ 23; ECF 18 at ¶23). Ms. Jackson told Ms. Blough that former female employees experienced similar challenges and that the best thing to do was to continue to talk to Mr. Cruz.  *Id.* at ¶ 23.  Ms. Jackson later called Ms. Blough and told her that she had reported what Ms. Blough had told her to Yvette Bryant, BCD's Senior Vice President of Diversity & Inclusion, and that Ms. Bryant would be calling her.  Ex. A, 112, l. 19-25).

Ms. Blough subsequently spoke with Yvette Bryant about the concerns Ms. Blough had about the development of her prospective client pipeline. (ECF 15 at ¶24; ECF 18 at ¶ 24).  Plaintiff alleges that Ms. Bryant spoke to her in a hostile manner and made her feel uncomfortable as if she were in trouble. (ECF 15 at ¶24).  Ms. Bryant told Ms. Blough that either Ms. Blough could talk to Mr. Cruz about the situation or she could.  Ms. Blough feared that she was being set up to get fired, she did not want to lose her job as she had two children in college, so she opted to speak to Mr. Cruz on her own. Ex. A, 113, l. 3-25; 114. l 1-7.

Ms. Blough then spoke with Mr. Cruz about her pipeline concerns and he stated that he and Mike Jannsen would "need to work that out." Ex. A, 114, l. 16-23.

In November 2019, Ms. Blough was directed by Mr. Cruz to yield her role on two substantial accounts to a female employee, Kessie Bratko, who held a non-sales position. (ECF 15 at ¶ 27). The rationale for Mr. Cruz's decision was that Ms. Bough had never handled accounts this big. However, Ms. Bratko had never been in on any sale. *Id.* at ¶ 28. Nonetheless, Ms. Bratko was tasked with making the decisions and setting the strategy and did not follow the standard sales process. *Id.* The J&J bid was lost. *Id.*

Inter-company messages exchanged between Ms. Bratko and others, including Mr., Cruz, revealed an effort to demean Ms. Blough and to force her out of BCD.[2]

Other instances of discrimination and personal attacks occurred in that same time period. In late 2019, Ms. Blough was demeaned by Mr. Cruz at a dinner with co-workers Lesley O'Bryan, Thad Slaton, and Andy Menkes. When the discussion turned to opportunities to talk at events sponsored by BCD, Ms. Blough asked how she could get on the speaker list and Mr. Cruz responded by asking her, "Do you even know how to speak in front of people?" Ex. A , 135, l. 20-25; 136, l. 1-19. These comments cause Ms. Blough to feel demeaned and embarrassed. *Id.* at l. 18-19. Mr. Cruz has no recollection of the dinner or any conversation about speakers. Ex. C, 80, l. 14-19.

The mistreatment and maltreatment continued from the time she was promoted in 2019 until her constructive discharge in October 2021. Her mental health and well-being suffered as a result and continues. (ECF 15 at ¶ 34).

---

[2] Emails and chats with these conversations are among the documents that BCD has designated as "Confidential." Plaintiff is seeking to file these documents under seal.

## IV.    COUNTER-ARGUMENT

### A.    Ms. Blough presents sufficient evidence of gender discrimination on which a reasonable jury could conclude that BCD discriminated against her based on her gender in violation of Title VII.

A Title VII claim for gender discrimination is analyzed under the burden shifting framework of *McDonnell Douglas*. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This framework first requires a plaintiff to establish a prima facie case of discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). Those elements are that a plaintiff must establish that she:  (1) is a member of a protected class, (2) qualified for the position, (3) suffered some adverse employment action (4) under circumstances that give rise to an inference of unlawful discrimination. *Id.* at 410-411.

BCD concedes that Ms. Blough is a member of a protected class and that she was qualified for the position she held. *See* Memorandum of Law, ECF 72, p. 3.  BCD argues, however, that Ms. Blough cannot demonstrate the third and fourth elements of a prima facie case:  that she suffered some form of adverse employment action under circumstances that give rise to an inference of unlawful discrimination." *Jones* at 410-11 (internal citations omitted).[3] To establish these elements, the evidence a plaintiff offers "must be sufficient to convince a reasonable factfinder to find all of the elements of the prima facie case." See *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (discussing Title VII gender discrimination at the summary judgment stage).

---

[3]    A plaintiff may also meet the last element by showing that the adverse employment action "occurred under circumstances that could give rise to an inference of intentional discrimination." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013), citing *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008).

6

Should a plaintiff succeed in establishing a prima facie case, the burden then shifts to the defendant to articulate a "legitimate nondiscriminatory reason" for the adverse employment action. *Jones*, 198 F.3d at 412. To prevail after defendant articulates that reason, a plaintiff must show that such reasons are pretextual and that discrimination was the real reason for the adverse action (*Id.* at 412-13) by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably disbelieve either (1) the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a [but for] cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### 1. Ms. Blough established a prima facie case of gender discrimination

#### a. Ms. Blough was subjected to an adverse employment action

Ms. Blough was subjected to adverse employment actions consisting of the assignment of accounts that were less desirable than those assigned to male employees, some of whom held a lower position than the Vice President role she held, that her role as a leader on accounts was usurped by the assignment of others within BCD who undermined the opportunity to grow and nurture the relationship with the prospective client, or who lacked sales experience. The result of these actions was that BCD lost those potential accounts.

The argument that there was no discriminatory conduct that occurred within what BCD claims is the applicable statute of limitations for gender discrimination claims (that is, within 300 days from the allegedly discriminatory act in deferral states such as Pennsylvania) is without merit. Ms. Blough has alleged an ongoing practice of discrimination starting from the initial assignment of her accounts through her complaints about the insufficiency of her pipeline as compared to male employees and Ms. Cruz through her constructive discharge. The 300-day statute of limitations for gender discrimination is not absolute as it does not apply where, as here, a defendant's unlawful

conduct has been part of an ongoing practice. *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)).

The exception to the 300-day requirement for ongoing unlawful conduct is known as the "continuing violations doctrine." See e.g., *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 540 (W.D. Pa. 2010). As the court explained in *Kimes*:

> Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." [*Cowell*, 263 F.3d at 292] (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). The United States Court of Appeals for the Third Circuit has set forth a two part test to determine whether the continuing violation doctrine applies to a given case. "First, [the plaintiff] must demonstrate that at least one act occurred within the filing period . . . Next, the plaintiff must establish that the [alleged wrong] is more than the occurrence of isolated or sporadic acts." *West v. Phila. Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995).

*Kimes v. Univ. of Scranton,* 126 F. Supp. 3d 477, 492 (M.D. Pa. 2015).

An adverse employment action need not be "significant... or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). A plaintiff merely has to show that there was "some injury respecting [plaintiff's] employment term or conditions... [that] left [plaintiff] worse off." *Id.* at 359. The facts propounded Ms. Blough demonstrate that the issues with her pipeline of accounts were raised by her to Mr. Cruz from the date of her promotion, that she complained of being usurped as the lead when Mr. Menkes was hired and assigned the BD and UPS accounts, when Ms. Bratko, who had no sales experience, was assigned as lead on the J&J account, and when Ms. Blough advocated for a more robust pipeline to no avail. Rather, there was

8

a collective effort by Mr. Cruz and others to cut Ms. Blough out of opportunities and ignore her protests of unequal treatment in the assignment of accounts.

Removing or limiting the potential to generate business and the financial benefit that would result for Ms. Blough is an adverse employment action as the District Courts have recognized. See *Robinson v. Euro Motors*, No. 22-736, 2024 U.S. Dist. LEXIS 180718, 2024 WL 4394737 at *14 (E.D. Pa. Oct. 3, 2024); *Smith v. Presidio Networked Sols., Inc.*, No. 22-736, 2024 U.S. Dist. LEXIS 112285, 2024 WL 3203314, at *14 (E.D. Pa. June 26, 2024) (finding that taking "key accounts away from" a plaintiff who earns commissions is "sufficient to show adverse employment action."); *Dawson v. Philadelphia Media Holdings, LLC*, No. 06-3604, 2008 U.S. Dist. LEXIS 55580, 2008 WL 2795832, at *16 (E.D. Pa. July 18, 2008) (finding that "for purposes of summary judgment," the defendant's "alleged failure to assign [the plaintiff] a fair share of sale leads" constituted an adverse employment action.).

BCD's actions in the way it assigned Ms. Blough's accounts and prospects and took away from her the opportunity to pursue those prospects using the skills and experience she possessed while diverting opportunities to males, including Mr. Menkes, interfering with Ms. Blough's efforts to procure the J&J account by assigning a person without any sales experience to be the lead on the account are facts a jury must consider in determining if there was gender discrimination. These facts give rise to an inference of discrimination and are not properly the subject of a summary judgment.

### b.    The assignment of accounts and prospects by BCD gives rise to an inference of discrimination

BCD argues that Ms. Blough cannot provide evidence from which a factfinder could infer that its assignment of accounts was discriminatory. ECF Doc. 72. p. 6. Acknowledging that case law supports the argument that an inference of discrimination can be established by showing that

9

a plaintiff was treated differently than similarly situated employees, BCD's argument continues that a plaintiff is required to provide comparator employees and failing to do so entitles a defendant to summary judgment. *Id.* This argument takes an unduly narrow interpretation of gender-based discrimination which is not supported in law and in fact.

Contrary to BCD's argument, there is no requirement that Ms. Blough must identify similarly situated comparators who were treated differently in exactly the same manner in order to meet the fourth element of her prima facie case. Comparator evidence is one way to show circumstantial evidence of discrimination, but the Third Circuit has "explicitly rejected" that comparator evidence is required. *Bullock v. Children's Hosp.*, 71 F. Supp. 2d 482, 487-88 (E.D. Pa. 1999) (collecting cases and noting that he nexus required to invoke the presumption that a plaintiff was discriminated against is that the plaintiff was subjected to less favorable treatment, not simply that someone else in her class was treated less favorably).

The larger issue is whether Ms. Blough can "point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [discrimination] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers*, 142 F.3d 639, 644-45 (3d Cir. 1998). That evidence is that when Ms. Blough was initially assigned to accounts, she complained about the adequacy of her pipeline to her supervisor, Mr. Cruz, and that despite her complaint, she was ignored. Instead of invigorating her pipeline, Mr. Menkes was inserted into two of her prospects and another prospect was diverted to Ms. Bratko who had no sales experience, Mr. Cruz assigned accounts to Regional Directors[4] who were one step below Ms.

---

[4]    Messrs. Maanicus, Dewey and Winkler were all Regional Directors, one step below that of the Sr. VP role held by Ms. Blough. Ex A, 86, l. 3-13; 87, l. 20-25; 80, l. 15-20.

Blough, and that Mr. Cruz benefitted economically from the retention of accounts by Ms. Cruz even after her move outside of Global Sales.

While BCD urges that Ms. Cruz is a "comparator" of Ms. Blough, that argument is without merit. Ms. Cruz's commissions inured to the benefit of Mr. Cruz as they were married and filed joint tax returns. [cite]  Therefore, permitting her to retain accounts, even after she left her Global Sales position, benefitted him directly.

Ms. Blough has not alleged a "paramour preference" claim as BCD suggests in its Brief. Ms. Blough's claims are that she was discriminated against by the assignment of favorable accounts to males and Ms. Cruz and the retention of accounts and the commissions generated by those accounts by males and by Ms. Cruz which created a direct benefit to Mr. Cruz.

Summary judgment should be denied on the claim of gender discrimination under Title VII because the case turns on the credibility of witnesses. A fact finder in this matter would be required to make a determination as to the facts as presented by Ms. Blough and those proffered by BCD. Based on the Concise Statement of Material Facts of BCD (ECF 75) and the response of Ms. Blough to those facts, there are numerous disputes as to the truth of the alleged facts. As the Supreme Court has held:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-151 (2000).

11

BCD has not proffered uncontradicted and undisputed evidence from disinterested witnesses and its motion for summary judgment on the claim of gender discrimination should be denied.

2.    **BCD has failed to articulate a legitimate, non- discriminatory reason for the assignment of account prospects sufficient to entitle it to summary judgment.**

While BCD recites its stated practice with regard to assigning current or prospective accounts (see ECF 70-5 ¶¶ 8-9), there is nothing contained in those statements to support the fact asserted in its argument that it has followed these practices and set forth a legitimate non-discriminatory reason for not assigning Ms. Blough more robust account prospects. The record reflects that Ms. Blough, a viable VP of Global Sales was displaced as the lead person on at least three accounts. BCD assigned Ms. Bratko, a non-sales employee, to the J&J account. That sales effort was not successful. Mr. Menkes was assigned to the BD and UPS accounts leaving Ms. Blough in the lurch as to her role and both prospects failed to materialize. Additionally, accounts that had been handled at the VP level were reassigned to Regional Directors.

A determination of the veracity of the alleged reasons why BCD made these decisions is a jury function. *Reeves, supra.*

3.    **The evidence support pretext**

The issue in this matter is the on-going assignment of lucrative work to males or to a female directly linked economically to the person assigning the leads. It is not for the Court to sit as a super human resources department and reviewing an employment decision. This suit challenges as discriminatory BCD's very pattern and practice of assignment of ongoing work, which may be discriminatory even if it is not perceived as such.

12

Courts have determined that pretext exists when a decision is foolish or unfair or lacking in good cause, among other reasons. See: *Fuentes v. Perskie,* 32 F.3d 759, 765 & n.8 (3d Cir. 1994) (foolish or imprudent decisions can be found pretextual), and *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) (quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1341 (1st Cir. 1988). It then becomes a jury question to determine if the evidence is sufficient to support the plaintiff's case.

BCD argues that many non-discriminatory factors are used in assigning leads (see Defendant's Brief at pp.8-9), but this argument is made at a tree-top level without any explanation of how these factors, when applied, managed to favor males and the one female linked to the assignor or, in fact, whether these factors were applied. Without more, the assignment of client leads reeks of pretext and falls far short of explaining how Ms. Blough was on the short end of the stick with regard to assignments and how males benefitted. Ms. Blough is entitled to a full explanation of the assignments, and so is the jury. A reasonable factfinder could disbelieve BCD's articulated reasons for the assignment process and believe, instead, that there was an invidious discriminatory reason per *Fuentes, supra; St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993), and *Desert Palace Inc. v. Costa*, 539 U.S. 90, 100 (2003).

**B.    Ms. Blough was subjected to a hostile work environment and was constructively discharged**

The elements of a claim for hostile work environment that a plaintiff must show are that "(1) [s]he suffered intentional discrimination because of [her] age/sex; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected [her]; (4) the harassment would detrimentally affect a reasonable person in that position; and (5) respondent superior liability." *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (Title VII). "The alleged harassment 'must be

so severe or pervasive that it alters the conditions of [plaintiff's] employment and creates an abusive environment.'" *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001). "Stray" or "offhand" remarks "generally are considered insufficient to support an inference of discrimination." *Id.*; see also *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)).

The terms "severe" and "pervasive" "represent two distinct types of hostile work environment claims." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* The determination of either is based on the totality of the circumstances rather than individual incidents. See *Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (courts should "concentrate not on individual incidents, but on the overall scenario"). "In determining whether an environment is hostile or abusive, we must look at numerous factors, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance." *Weston*, 251 F.3d at 426 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Although offending conduct must be either "severe" or "pervasive," courts should take care to not only "parse out the individual incidents," but consider the totality of the conduct in determining "whether the acts that collectively form the continuing violation are severe or pervasive." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013).

It is a factual issue for a jury to determine if Ms. Blough was subjected to severe and pervasive intentional conduct by BCD because of her sex and if that conduct detrimentally affected

Ms. Blough as it would have affected any reasonable woman from functioning in the work environment and resulted in her constructive discharge. As such, summary judgment should be denied on Ms. Blough's constructive discharge claim.

**C.      Ms. Blough has articulated evidence sufficient to show that BCD breached its contract with Ms. Blough and to deny summary judgment.**

BCD made a decision to suspend commission earning window for quarters two through four of 2020. This shifted the period of time for commissions to be paid. (ECF 69, ¶ 40). Ms. Blough, along with other BCD commissioned employees, was bound by this decision. The difference between Ms. Blough and other BCD employees who were entitled to commissions is that Ms. Blough was subjected to discrimination and harassment based on her sex which caused her to be constructively discharged before the opportunities she worked on matured into contracts.

BCD created a climate of discrimination toward her that was pervasive and severe. Despite her complaints and repeated questions as to her pipeline, she was ignored and discriminated against to the extent that she could no longer function in that environment. That environment was not of her making but rather that of BCD and it resulted in Ms. Blough's constructive discharge. Through no fault of her own, that discharge occurred prior to the date on which her commissions matured. She should not be penalized for the bad conduct of BCD in constructively discharging her and depriving her of commissions that were due and owing to her.

Summary judgment should be denied on this count and the claim should proceed to trial.

**D.      Ms. Blough has articulated evidence sufficient to show that BCD violated the Equal Pay Act and to deny summary judgment.**

The Equal Pay Act provides that an employer may not "discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance

of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In order to establish a prima facie violation of the Equal Pay Act, a plaintiff must allege that employees of the opposite sex were paid differently despite performing work that shared a "common core of tasks." *Brobst v. Columbus Servs. Int'l,* 761 F.2d 148, 156 (3rd Cir. 1985).

The Equal Pay Act applies only to allegations of discrimination based on gender. See, e.g., *Washington County v. Gunther*, 452 U.S. 161, 170 (1981) (noting that the Equal Pay Act applies to "wage differentials attributable to sex discrimination"). Ms. Blough has alleged discrimination based on gender in this action. Her claims are that males of equal and lesser rank than hers were favored and provided opportunities for better and more robust accounts. The question of whether BCD paid Ms. Blough less than her male counterparts is one of genuine material fact for the jury to decide.[5]

## V.    CONCLUSION

Viewing the facts in the light most favorable to Ms. Blough, the nonmoving party in this instance, drawing all reasonable inferences, and resolving all doubts, her in favor as the non-moving party (see *Matreale supra*, 487 F.3d at 152), the Court must deny BCD's motion for summary judgment.

---

[5]    Ms. Cruz, while a female, was not a comparator to Ms. Blough.  Her earnings were joint with Mr. Cruz's as evidenced by the fact that they filed joint tax returns.  Cruz depo.

Respectfully submitted,

METTE, EVANS & WOODSIDE

/s/ *Kathryn L. Simpson*
 KATHRYN L. SIMPSON, ESQUIRE
 Sup. Ct. I.D. No.  28960
 3401 North Front Street
 P. O. Box 5950
 Harrisburg, PA  17110-0950
 (717) 232-5000 - Phone
 (717) 236-1816 – Fax

October 17, 2025

17

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - -

TRUDY BLOUGH,                    )
                                 )
   Plaintiff,               )
                                 )
   vs.                       ) Civil Action No.
                                 )    2:23-cv-01979-MPK
BDC TRAVEL USA LLC,              )
                                 )
   Defendant.                )

- - - - -

DEPOSITION OF TRUDY BLOUGH

Thursday, September 5, 2024

Filed on behalf of the Defendant

Counsel of Record for this Party:

   Mark T. Phillis, Esquire
   Katelyn McCombs, Esquire
   Littler Mendelson, P.C.
   One PPG Place, Suite 2400
Pittsburgh, Pennsylvania  15222

- - - - -





PLAINTIFF'S
EXHIBIT

A

DEPOSITION OF TRUDY BLOUGH the Plaintiff herein, called by the Defendant for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Michelle L. Hall, a Registered Merit Reporter and a Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Littler Mendelson, P.C., One PPG Place, Suite 2400, Pittsburgh, Pennsylvania, on Thursday, September 5, 2024, scheduled to commence at 9:00 o'clock a.m.

- - - - -

COUNSEL PRESENT:

For the Plaintiff:

Kathryn L. Simpson, Esquire
Mette, Evan & Woodside, P.C.
3401 N. Front Street
P.O. Box 5950
Harrisburg, Pennsylvania   17110
klsimpson@mette.com

For the Defendant:

Mark T. Phillis, Esquire
Katelyn McCombs, Esquire
Littler Mendelson, P.C.
One PPG Place, Suite 2400
Pittsburgh, Pennsylvania   15222
mphillis@littler.com
kmccombs@littler.com

Also Present:

Deborah Elbaum, BCD Travel USA, LLC



A.    Okay.

Q.    If you want to read it in its entirety now, you can, but if you just want to read it as we go through, it's up to you.  Do you have a preference?

A.    Read it as we go through.

Q.    Okay.  If I could refer you, please, to Page 4, Paragraph 13.

(Witness reviewing document.)

Q.    Why do you believe that Sachin Sakhri and Ms. Cruz received more favorable treatment than you did?

A.    Well, it was documented in Salesforce who got accounts assigned to them when Mark O'Brien left BCD.  So, listed here in paragraph 15 are the accounts and who they got assigned to.  None of which were me.

Q.    So you had said Mr. Sakhri replaced Deborah Altman; correct?

A.    Susan Altman.

Q.    Susan Altman.  Sorry.

A.    Yes.

Q.    And at that time did he take over her accounts or was there a reshuffling of the accounts?

A.    He took over her accounts.



Q.   Okay.  And then Mark O'Brien left after Mr. Sakhri was hired?

A.   Yes.

Q.   And do you remember when he left?

A.   May of 2021.

Q.   Was Mr. -- and he was the one who was in the UK?

A.   Yes.

Q.   And was someone hired to take his spot?

A.   No.

Q.   So who were -- who was the VPs at global sales at the time that he left?

A.   Myself, Deb Cruz, Sachin, and Vanessa Moore in APAC.

Q.   Was Ralph Winkler a VP of Global Sales?

A.   No.  He was a director.

Q.   And where was he?

A.   In Europe.

Q.   So that's one step down; is that right?

A.   Yes.

Q.   And when Mr. Sakhri was hired, where was he located?

A.   I believe he is New Jersey.

Q.   Do you know what his background is?

A.   He came from Agencia, which is an online

Page 86

Q.    Where was Mr. Maanicus based?

A.    He was in Europe.

Q.    You identified a position as regional director?

A.    Yes.

Q.    And you said that's one step down from VP of Global Sales?

A.    Yes.

Q.    Was it customary for regional directors to be assigned accounts to work on?

A.    No.  Typically if there was a shift in global account, it shifted to another VP of Global Sales.

Q.    And would you then engage a regional director if you had a need for a regional director on the account?

A.    Yes.  For support.

Q.    And how did you learn that Mr. Maanicus had been given responsibility for these accounts?

A.    I looked in Salesforce.

Q.    And was his the only name that was listed or is there a column that lists like the whole lead list?

A.    It's -- yeah, it's a designated sales lead list.  It's a designated sales lead.



Q.    So if there were no regional -- if there was no regional VP assigned to it but there was a regional director assigned to it, would that regional director then be the sales lead?

A.    Can you restate that?

Q.    If Salesforce didn't show that there was a VP of Global Sales assigned to an account, but it showed that there was a regional director assigned to the account, did that mean that the regional director was the lead for that account?

A.    Yes.

Q.    Do you know where in Europe Mr. Maanicus was?

A.    France.

Q.    Did you ever work with Mr. Maanicus?

A.    No.

Q.    So you didn't have accounts where you had to involve him?

A.    No.

Q.    You also said that a couple of accounts, British American Tobacco, Unilever, and Barclays, were assigned to Nick Dewey?

A.    Yes.

Q.    He was also regional director?

A.    Yes.



him in that role?

A.   Yes.  Yes.

Q.   Okay.  And so the idea -- the idea was that he could then help BCD, now being on the other side of the table because of his knowledge of how people did it on the corporate side of the table; is that right?

A.   Yes.  Yes.  Contribute to improving BCD's approach to RFPs is my understanding.

Q.   And who all did he work with?

A.   I mean, I -- he reported directly up to Mike Janssen; so whenever we were instructed to work with him.

Q.   Did you have occasion to involve him in any of your work?

A.   The -- well, the only two that he got involved in was BD and UPS, because Jorge instructed me to allow him to lead the process and he would be client facing.

Q.   So, BD, I think that was a prospect you got shortly after you started in your role; is that right?

A.   Yes.  I believe -- I believe that was one that Deb gave to me but --

Q.   Okay.  I was just looking at Exhibit 5.  It



does say that, you know, she already has Dell, BD, and I believe one other is what Susan --

A.   Oh, okay.  Then that came from Susan.  Yep.

Q.   So, was there an active proposal or request for information with BD?

A.   Yes.  Yep.

Q.   Approximately what time?

A.   I have -- that was 2018.  Well, June, because if you look at -- yeah, 19a.  "In June of 2018, Jorge Cruz directed Blough to relinquish her leadership role to Andy Menkes in the middle of the sale process for BD."

Q.   Should that be -- because you didn't start in the role until July of 2018.  So would that -- should that be 2019?

A.   That could be, because March 9th, 2019, Jorge Cruz directed -- yeah, that would probably be '19.

Q.   Okay.  So, what explanation did Mr. Cruz give you for why he wanted Andy to be involved with BD?

A.   Because he had the relationship with the travel manager.

Q.   So, Mr. Menkes knew the travel manager who was putting the RFP out for BD?



A.    Yes.

Q.    So what role did Mr. Menkes play then in the proposal?

A.    So, he had all -- all contact with the -- with the prospect.  He was leading the strategy for the sales process; the presentation, which was in Europe, which I didn't even get to go to because -- because Jorge said that I didn't need to be there, Andy was there.

So, pretty much everything from the time that Andy got involved, he took over the sales role.

Q.    So were you -- did you work with him on preparing the proposal or getting the information from pricing or --

A.    The RFP submittal -- so all of the documentation that was out the door -- and so from the time that we got to put things together for a presentation and what was going to be presented to the client, the strategy, you know, of the approach of the sale to the client when we were in front of them, that was all Andy.  I -- I wasn't allowed to direct the team on it.

And it was -- it was actually a retention/expansion; so, the account management



Q.    The conversation that you had with Ms. Jackson, do you remember if it was around the time of either the UPS or the BD transaction?

A.    I honestly don't.  I don't remember when it was.  It was not winter because we were out on a rooftop.

Q.    Was that an internal conference or meeting that you recall?

A.    Yeah.  Yeah.  I think we were in Atlanta, and I can't even -- I don't even know.  I can picture the -- I can picture where we were standing, I just can't remember what town we were in.  It could have been in Chicago.

Q.    In the following paragraph, paragraph 24, you said you later spoke to Yvette Bryant in human resources?

A.    Yes.

Q.    How did you come to speak with Ms. Bryant?

A.    Kathy called me and she said, "As an officer of this company, I have to do the right thing and report what you told me.  So, I did talk to Yvette, and she will be calling you."

Q.    What did you tell Ms. Jackson when she told you that?

A.    I said, "I understand."  You know, "I'll

talk to her when she calls."

Q.  And did you talk with Ms. Bryant?

A.  I did.  I did.  And I shared with her the -- you know, some of the same things that I shared with Kathy:  just my frustration and that I didn't feel like I was fairly being treated, and that, you know, I didn't have the respect of Jorge. And I didn't mention don't cross the Cruzes.  I didn't say anything about that.

And I can't remember exactly what she said.  I mean, I remember her giving me the option, "Do you want me to talk to Jorge or do you want to work this out with him?"  But at the time she was asking me, you know, "Have you talked to your other -- the other employees about this, like your peers?  Do they know?"  You know, "Are they experiencing this?"

At the time I know that there was a -- a case against BCD going on; same situation, actually.  And I felt like -- I felt like I was being kind of pushed into a corner of making this seem like this was more me, not -- not Jorge.  And I was just like --

I -- I didn't know want to lose my job at that point.  I had two kids in college, single.

MAGNA

So, I was just like, "I'll just talk to Jorge about it.  I talked to him many times about it, but I'll give it another shot."

Q.    So you felt that she was dissuading you from having her talk to Jorge; is that what you're saying?

A.    Yeah.

Q.    And what made you feel that?

A.    Just by her talking about the other people that I work with, and, you know, "Is anyone else having this problem?"  And I just felt like I wasn't being heard anyway.

Q.    Did you tell her that other people had made comments about the Cruzes and not --

A.    No.

Q.    Did you talk to Mr. Cruz after this discussion with Ms. Bryant?

A.    Yeah.  It was the same -- you know, the same thing.  That, you know, "I've asked you multiple times to right-set the pipeline and just fairly distribute it."  And, you know, then he said the same thing he always said to me:  "Mike and I need to work that out."

Q.    Did you give him any examples of why you thought the pipeline needed -- you know, why the



A.   Thad is --

Q.   Thad.

A.   Thad is -- yeah.  I mean, I worked with him as far as marketing goes.  Also for, you know, sponsoring events, going to meetings and events types of things.  He wasn't involved with like day-to-day sales, you know, if -- he wasn't an SME or anything.  But I did have interactions with him.

Q.   It does say here this was for purposes of the meeting with UPS.  I just noticed that.

A.   Okay.

Q.   So, in this, you talk about kind of two conversations.  A conversation, a side conversation it sounds like you had with Mr. Cruz?

A.   No.  This was -- this was the whole table.

Q.   Oh, okay.

A.   Yes.

Q.   So, can you tell me what the speaking opportunities were that were being discussed.

A.   Yes.  There's times when there is a conference or convention or something that we may be sponsoring and we have the opportunity to be a speaker at the event, and there was a speaker list that BCD worked off of that various people within the organization with different skill sets and



Page 136

knowledge base they would pull from to talk about consulting or talk about, you know, account management or -- you know, it just depended on -- sustainability, things like that; so, depending on the SME in that area.  But, yeah.

So we were sitting there talking, and, you know, like Lesley and -- actually, Gary Reeves was there as well.  They were talking about, you know, having speaking opportunities and the list, and so I just, you know, brought it up, you know, "How do I get on that list?"  I mean, "What do I do to get on that list?"

And, you know, in front of everybody, Jorge was like, "Do you even know how to speak in front of people?"  And I don't know if he was joking or not, but I'm amongst senior leadership at the organization and just trying to make a name for myself, and it stuck with me.  So it just felt very demeaning, and I was just embarrassed.

Q.   Did anybody say anything to you after that meeting, anybody else who was in attendance at that dinner?

A.   No.

Q.   Do you remember what anybody said after he made that comment?



that.  Yeah, it was months before that that he -- that he was canceling, canceling our calls.  But I don't have the exact time frame.

Q.   Do you know if he was continuing to have huddle calls with the other -- with your peers, the other VPs of Global Sales?

A.   I don't.

Q.   Exhibit 9, it looks like you received your formal offer from American Express on October 8, 2021.

A.   Uh-huh.

Q.   When did you notify BCD that you were going to be leaving?

A.   When did I -- you would have a copy of that notification.

(Blough Exhibit No. 11 was marked for identification.)

Q.   Do you want to take a moment.  There's an e-mail chain here; so --

(Witness reviewing document.)

A.   Okay.  So October 14th is when I put my resignation in.

Q.   Did you talk to -- did you talk to Mr. Cruz before you sent this e-mail, or did you notify him via e-mail?

MAGNA

A.    I talked to him on -- yeah, I talked to him on the phone before, and then I let him know that I was going to be officially sending it after we got off the phone.

Okay.  So, yeah, we talked on October 13th, and then I sent him the resignation letter on October 14th.

Q.    When you spoke with Mr. Cruz, what did you tell him was the reason that you were leaving?

A.    I told him that, you know, I've been trying to get him to right-set my pipeline for years; that I don't feel like I was respected, that I was valued; and that I just -- you know, I felt like at times, you know, I was embarrassed by the way he treated me and the way that he handled the opportunities.  And that, you know, at that point, I mean, I had gone through stress and anxiety and I -- I just was at the point where I just couldn't do it anymore.

And he, you know, acknowledged, yes, I know that, you know, with Andy, UPS, BD, you know, and everything with Johnson & Johnson, you know, he verbally acknowledged all of that to me.  And I just told him I didn't -- I didn't feel like at this point that I could proceed forward with



# EXHIBIT B







EXHIBIT

Cruz 3

exhibitsticker.com

BCD-BLOUGH_000336

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRUDY BLOUGH,              : CASE NUMBER 2:23-CV-01979-MPK
        PLAINTIFF :
                          : JURY TRIAL DEMANDED
        VS.               :
                          :
BCD TRAVEL,               :
        DEFENDANT :

REMOTE DEPOSITION OF JORGE CRUZ

Wednesday, October 9, 2024

9:01 a.m.

Bethann M. Rogers, RPR, Court Reporter
Notary Public

DEVINE DEPOSITIONS
573 Indian Run Drive
Hummelstown, Pennsylvania 17036
(717) 612-2403

**PLAINTIFF'S EXHIBIT**
C

APPEARANCES:

METTE, EVANS & WOODSIDE
BY:   KATHRYN L. SIMPSON, ESQUIRE
3401 NORTH FRONT STREET
HARRISBURG, PENNSYLVANIA 17110
(717)232-5000
klsimpson@mette.com

-- FOR PLAINTIFF

LITTLER MENDELSON P.C.
BY:   KATELYN McCOMBS, ESQUIRE
      CAROLINE M. ORRICO, ESQUIRE
ONE PPG PLACE
SUITE 2400
PITTSBURGH, PENNSYLVANIA 15222
(412)201-7600
kmccombs@littler.com
corrico@littler.com

-- FOR DEFENDANT

ALSO PRESENT:   TRUDY BLOUGH
                DEBORAH ELBAUM, ESQUIRE, BCD TRAVEL
                AMY AU, ESQUIRE, BCD TRAVEL

INDEX OF WITNESS

                                                          EXAMINATION

JORGE CRUZ

   By Ms. Simpson                                              4


                        INDEX OF EXHIBITS

CRUZ EXHIBIT                                                  PAGE

Exhibit 1 - Text Messages                                     33

Exhibit 2 - Email Chain                                       52

Exhibit 3 - Global Sales & Marketing                          63
            Organizational Chart

Deposition of Jorge Cruz                    Trudy Blough v. BCD Travel USA, LLC

Page 60

portion of Johnson & Johnson, so it just made logical sense. In many cases when we have an existing client this can be treated as an expansion, so Kessie was the business owner, and we were helping her drive a greater wallet share of the Johnson & Johnson, not unique at all.

Q. Do you know what Ms. Bratko's expertise was with regard to the bid process?

A. Kessie is a life sciences expert so again utilizing when you're responding to a request for proposal ensuring that our answers are hitting the mark. But, yes, she had vast experience in the life science sector on answering, creating strategy, talk track around what our value proposition is.

Q. But the question was specifically with regard to the bid process. What knowledge did she have of the bid process?

A. Specific to Johnson & Johnson are you saying?

Q. Yes.

A. She was part of the team that was facilitating the bid. Trudy as the global lead and remained as the global lead was responsible for facilitating the RFP process, the deliverables, the timeline in which we're submitting our answers, and so forth. So there's not a lot of knowledge that's needed

Page 61

on an RFP process in terms of the administrative side.

Q. Question about Susan Altman, she left the company in April of 2019. Is that correct?

A. I don't recall.

Q. You know that she left?

A. Oh, yeah, 100 percent, yeah, yeah, yeah.

Q. Do you know the reason?

A. I think she was dissatisfied with the organization meaning she resigned from the company.

Q. Yes, okay. Did any of her prospects end up being reassigned to Ms. Blough?

A. I don't recall, but I would imagine that there would have been some. As I mentioned earlier, when a person departs, you keep a portion of the pipeline for the replacement person. Those that are more imminent or in progress from a process perspective would have been reassigned.

Q. You're familiar with an individual by the name of Mark O'Brien, correct?

A. I am.

Q. Did he ultimately leave the organization?

A. He left the organization, correct.

Q. And do you know whether or not any of his prospects ended up in Ms. Blough's pipeline?

A. I don't recall offhand. Mark was based in

Page 62

the UK, so that pipeline would have mostly been preserved for a replacement person based in Europe, not in the US.

Q. Are you familiar with an individual by the name of Sachin Sekhri?

A. I am.

Q. Can you tell me about him, please.

A. He's an individual contributor, vice president of global sales, I think joined our organization in the late 2019, 2020, somewhere around there.

Q. Do you know where he got his pipeline? Where did the accounts come from that were given to him?

A. Yeah. If the timing is accurate, I think he would have inherited a portion of Susan's pipeline.

Q. At the time, again we're talking about late 2019, you were aware that Trudy was making -- raising questions about the adequacy of her pipeline. Is that correct?

A. There were conversations, correct, yep, by the way not unlike other salespeople. Salespeople are always eager to have a bigger, larger, more active pipeline. But yes.

Q. So was it your understanding that in late 2019 Ms. Blough's pipeline was at the level that it

Page 63

should have been?

A. Based on skill set, based on geography, based on industry sector, yes.

MS. SIMPSON: If you could call up the exhibit that is the organization chart global sales and marketing with pictures on it.

(Cruz Exhibit 3 marked for identification)

BY MS. SIMPSON:

Q. Mr. Cruz, do you recognize what's been marked as Exhibit 3?

A. I do.

Q. What is that?

A. Looks like a global sales and marketing organizational chart.

Q. And can you tell by the people who are on this chart approximately what time period we're talking about?

A. It appears it would have been somewhere in 2019.

Q. So Mr. Sekhri is on here down in the lower right hand corner. Is that correct?

A. Correct.

Q. And I think you just testified that that's approximately when he was hired, so I guess we're okay

Deposition of Jorge Cruz                                    Trudy Blough v. BCD Travel USA, LLC

Page 64

with that. And it has Ms. Cruz on the right hand side. Do you see that?

A.    I do.

Q.    Okay. And it also has a line going from her to the right pointing to the right, and it says Kathy Jackson, right?

A.    That is correct.

Q.    But there's also a line that goes from her to you. Do you see that?

A.    I do.

Q.    Do you know why that's there?

A.    Because she's part of the sales goal, and while she reported to Kathy, she had a similar role as you asked earlier as the other VP of development, so.

Q.    Can I take you to the selection process for the vice president of media and entertainment. Do you know when that process started?

A.    I don't recall.

Q.    Do you know what the process was? How was it that it was decided that there needed to be a vice president for media and entertainment?

A.    I do not.

Q.    You were not involved?

A.    I was not involved in the decision, correct.

Q.    Were you involved in any of the process?

Page 65

A.    I had none.

Q.    Who was?

A.    It would have been most likely Mike Walley, Michelle Lawley, probably Jennifer Townsend at that point, and maybe Mike Janssen as well.

Q.    Was this position advertised within the company?

A.    I don't recall.

Q.    Who would know whether it was or was not?

A.    Probably her direct supervisor.

Q.    Who?

A.    Probably her direct supervisor at that point.

Q.    Ms. Cruz's direct supervisor?

A.    Um-hum.

Q.    Yes?

A.    Yes.

Q.    Would that be Ms. Cruz's direct supervisor in a global sales role, or would that be Ms. Cruz's supervisor in some other role?

A.    Probably Michelle Lawley that was making the hire for the vice president of media and entertainment she would have the specifics. I was not involved in the process, so I don't recall -- I don't recall it.

Q.    Do you know whether there were any other candidates for this position?

Page 66

A.    I do not.

Q.    Did Ms. Cruz ultimately get hired for this role?

A.    I believe she did, yes.

Q.    Do you know what the job entailed?

A.    I do not.

Q.    Do you know whether she had a quota?

A.    I do not.

Q.    Do you know which executive team member carried the quota responsibility for this role?

A.    I do not.

Q.    Do you know whether or not sales leads around the globe were instructed to transfer all media and entertainment prospects to Ms. Cruz?

A.    I believe at the instruction of Michelle Lawley, yes.

Q.    Did Ms. Cruz transfer her non-media and entertainment accounts to other sales leads?

A.    I don't recall what she was allowed to keep or not or what she transferred.

Q.    Do you know if there were any complaints or concerns expressed about the fact that others might not have been considered for this job that Ms. Cruz got?

A.    Not that I'm aware of, no.

Q.    When Mr. O'Brien left BCD in May of 2021, do

Page 67

you know who was assigned to the Bank of America account?

A.    I don't recall -- I don't recall Mark O'Brien ever having responsibility globally for the Bank of America account, so.

Q.    Do you know whether or not the Bank of America account was ever assigned to Ms. Cruz?

A.    I believe that was in her existing pipeline, yes.

Q.    So after she became the media and entertainment executive, would that have been one of those accounts that she would no longer handle?

A.    I don't recall. I don't recall exactly again what she was allowed to maintain or not.

Q.    Do you know whether the global sales lead was ever changed in Salesforce on the Bank of America opportunity?

A.    I don't recall.

Q.    Did it ever come to you?

A.    Come to me?

Q.    Yeah. Was it ever -- were you ever the sales lead on Bank of America?

A.    I think at one point I was trying to lead the sales effort for Bank of America, yes.

Q.    Do you know when that was?

Page 80

conversation was about.

Q. In your role do you get requests from those holding industry events for speakers or presenters?

A. I personally do not, no. I've got folks on my team that field those requests.

Q. Do you have any input into who should be recommended or promoted as speakers at these events?

A. No.

Q. Did Ms. Blough ever ask you about how she could put herself in position to be considered to be a presenter or a speaker at events?

A. I don't recall any conversation in that regard.

Q. Do you have any recollection of being at a dinner with her and others at Maggiano's in Atlanta when she made a request like that?

A. I have recollection of the dinner and who was there, I believe, but again have no recollection of any conversation about speakers or desire to be a speaker.

Q. Is Mr. Janssen a personal friend of yours?

A. I have a great deal of respect for Mike as a person professionally and business wise. Yeah, I would call him a work friend, absolutely.

Q. Is that true of his relationship with Debra Cruz?

Page 81

A. I can't speak for that relationship.

Q. You've observed it, though, right?

A. I can't speak for -- I can't speak for the relationship on who considers who a friend.

Q. Have you socialized outside of work -- strike that. Did Ms. Blough tell you that she was planning on resigning in October of 2021?

A. Yeah, she told me on a huddle call. That was my first knowledge of her resignation.

Q. What reaction did you have to Ms. Blough telling you that she was going to be resigning?

A. A bit surprised.

Q. Why?

A. Because there had never been any, you know, conversations about emotional stress or all the things that were outlined in the resignation letter so very surprised in terms of what followed immediately after the call.

Q. Well, she told you in the call, did she not, the reason she was resigning?

A. She -- I don't think -- I don't recall going into that level of detail. The call did not reflect the actual written message from what I recall.

Q. In the call did she tell you that she did not feel that she was as empowered as others?

Page 82

A. I don't recall the conversation.

Q. Did Ms. Blough tell you that she was concerned about being instructed to yield the lead on key deals to Kessie, Lisa, and Andy?

A. I don't recall, and had it happened she was never instructed to yield the lead, so that would have been -- that would have been a different conversation. I remember it just being a very short and sweet conversation.

Q. Did she tell you that she was upset, concerned, whatever about the quality of her pipeline?

A. On the resignation call?

Q. Yes.

A. I don't -- I don't recall that, no.

Q. Did she tell you that she was upset about the reassignment of Mark's accounts?

A. I don't recall that. Again, you're talking the resignation call? Are we still on the resignation call?

Q. Yes.

A. I do not recall that conversation.

MS. SIMPSON: Can we take a short break now.

(Recess taken)

BY MS. SIMPSON:

Page 83

Q. I was asking you some questions with regard to the assignment of the accounts when Mark left, and I did not ask you about Mr. Sekhri. He was given the GlaxoSmithKline account. Do you know why that assignment was made?

A. I don't recall. I would say based on skill set, industry sector, geography would have been in consideration, but I don't recall the specifics on GSK, GlaxoSmithKline.

Q. That is not a UK account, is it?

A. Its decisions are made in Jersey in the Northeast area, so the decisions are made in the US.

Q. And Mr. Sekhri was based in the US. Is that correct?

A. He was based in the Northeast, specifically in the New York, New Jersey area.

Q. How about Novartis?

A. Excuse me?

Q. How about the Novartis account?

A. I don't recall --

Q. N-o-v-a-r-t-i-s.

A. Yeah, I'm familiar with Novartis. I don't recall the assignment of that account and the rationale behind, so.

Q. And finally how about Mars?

## CERTIFICATE OF SERVICE

I hereby certify that on this 17 day of October, 2025, the foregoing document was filed using the Western District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, upon all counsel of record.

Respectfully submitted,

METTE, EVANS & WOODSIDE

By:   *Kathryn L. Simpson*_____
KATHRYN L. SIMPSON, ESQUIRE
Sup. Ct. I.D. No.  28960
3401 North Front Street
P. O. Box 5950
Harrisburg, PA  17110-0950
(717) 232-5000 - Phone
(717) 236-1816 - Fax

Attorneys for Plaintiff

Date:   October 17, 2025

3452735v1

18