**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRUDY BLOUGH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 23-1979 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re:  ECF No. 71 |
| BCD TRAVEL USA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPINION AND ORDER</u>**

**KELLY, Magistrate Judge**

Plaintiff Trudy Blough ("Blough") initiated this action against Defendant BCD Travel USA, LLC ("BCD") arising out of her employment, alleging employment discrimination, hostile work environment, breach of contract and violations of the Equal Pay Act.

Presently pending before the Court is Defendant's Motion for Summary Judgment.  ECF No. 71.  The matter has been fully briefed and is ripe for disposition. For the reasons below, the Motion for Summary Judgment is granted.[1]

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Local Rule 56C and Federal Rules of Civil Procedure 56(e)

At the outset, the Court notes that Defendant has made objections to certain portions of Plaintiff's Statement of Material Facts, ECF No. 75, as well as objections to Plaintiff's

---

[1]     In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment.  ECF No. 11.

[2]     The following facts are undisputed and are derived from the parties Joint Concise Statement of Material Facts, unless otherwise noted.  ECF No. 69.

Responses to Defendant's Concise Statement of Material Facts, ECF No. 74, on the grounds that she fails to comply with Federal Rule of Civil Procedure 56(c) and (e), Local Civil Rule 56(C)(1), and the Court's Summary Judgment Scheduling Order, ECF No. 68.  ECF No. 81 at 1-2.  Indeed, there are multiple instances where Blough fails to properly support her facts or deny BCD's proposed facts by citing to the record. Local Civil Rule 56.1.C requires that the party opposing summary judgment must respond to each numbered paragraph in the moving party's Concise Statement of Material Facts by: (a) admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material; (b) setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety with appropriate reference to the record; and (c) setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment. LCvR 56C.1.(a) - 56C.1.(c) (emphasis added).

The Federal Rules of Civil Procedure and the Local Civil Rules permit facts to be admitted where they are not properly opposed. See Fed. R. Civ. P. 56(e) ("If a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." ); see also LCvR 56(E) ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.").

Blough is represented by counsel, who is presumed to be familiar with these requirements and was put on notice of the same. ECF No. 68.

### B. Summary of Undisputed Facts

The Court has endeavored to summarize the undisputed material facts which have been appropriately referenced by record citations.

### 1. BCD's Business

BCD is a global corporate travel management company primarily servicing corporate customers in the making of travel arrangements and providing corporate travel management services. ECF No. 69 ¶ 1; ECF No. 73 ¶ 1. Blough acknowledged that she had received a copy of BCD's Employee Handbook, which contains BCD's Equal Employment Opportunity/Affirmative Action Policy, when she started her employment with BCD. ECF No. 69 ¶ 2; ECF No. 73 ¶ 4. The Equal Employment Opportunity/Affirmative Action Policy states: "It is our policy that no employee or applicant will be discriminated against because of race, color, religion, political opinion, sex, national or social origin, age, marital status, genetic information, disability or because he or she is a protected veteran." ECF No. 73 ¶ 2. BCD also maintains a Harassment Policy, which states:

> In accordance with applicable law, we prohibit sexual harassment and harassment because of race, color, national origin, ancestry, religion, creed, sexual orientation, physical or mental disability, marital status, medical condition, veteran status, age, or any other basis protected by federal, state, or local law. All such harassment is unlawful and will not be tolerated.

ECF No. 73 ¶ 3.

BCD has operations, sales employees, and clients in locations across the globe, including: North and South America, Europe, Africa, Middle East, and Asia. ECF No. 73 ¶ 5. Moreover,

3

BCD services clients in diverse industries, including media and entertainment, aerospace and defense, energy, and life sciences. ECF No. 73 ¶ 6.

In global sales, BCD utilizes a team-selling approach, meaning that there is often a global sales lead assigned to a prospect, but other BCD employees are assigned to the team to help secure the business and drive growth through collaboration. For example, in many cases a regional BCD employee is assigned to a specific client to help develop and drive the strategy in that specific region. Under the team-selling approach, the team could include specific industry and subject matter experts and others in the organization who have existing relationships with prospective clients. ECF No. 69 ¶ 3. BCD's practice of assigning current or prospective client accounts to its global sales teams takes into consideration multiple factors. ECF No. 69 ¶ 4; ECF No. 73 ¶ 8. Prospective accounts or opportunities are assigned to employees or sales teams based on several different factors, including but not limited to: an employee/sales team's geographic proximity to a client's principal location and the location of the decisionmaker; the timing of a request for proposal for the prospective client; the salesperson's experience with and knowledge of the client or prospect and its industry; previously established client relationships; and the salesperson's overall sales seniority/experience, current workload/bid activity, and work history, with no single factor being dispositive. ECF No. 73 ¶ 9. Additionally, when a salesperson leaves BCD, a portion of that salesperson's pipeline generally remains unassigned to ensure that there will be prospects for the salesperson who is hired to fill that position, though accounts with imminent bids or active bids in progress typically would be reassigned to an existing salesperson. ECF No. 69 ¶ 5; ECF No. 73 ¶ 10.

## 2.    Plaintiff's Employment With BCD

Blough began her employment with BCD in February of 2012 as an Account Manager and was promoted to Director, Regional Sales – Northeast Territory in June 2014. ECF No. 69 ¶ 6.  In that role, prospects were identified for the directors based on where the client was located sometimes determined by where the company's headquarters were located; sometimes determined by where the travel manager was located. ECF No. 69 ¶ 7; ECF No. 73 ¶ 12.  Blough was promoted to the Vice President, Global Sales position on or about July 9, 2018. ECF No. 69 ¶ 8. Blough was offered that position after interviewing with Jorge Cruz, Executive Vice President, Global Sales and Marketing, and speaking with Debra Cruz, Vice President, Global Sales, and Mark O'Brien, Vice President, Global Sales. ECF No. 69 ¶ 9. She had an annual salary, and she was eligible to earn commissions. ECF No. 69 ¶ 10.

In that role, Blough worked remotely from the greater Pittsburgh area and reported to Mr. Cruz. ECF No. 69 ¶ 11.  Blough did not have any previous experience in global sales when she was offered the Vice President, Global Sales role. ECF No. 73 ¶ 17. When Blough started in this new role in 2018, she retained accounts from her Regional Sales Director position in her pipeline where a request for proposal was active. ECF No. 69 ¶ 12.  At Mr. Cruz's direction, Debra Cruz and Susan Altman, both Vice Presidents of Global Sales, also gave Blough five prospects in their sales pipeline. ECF No. 69 ¶ 13.  Additionally, she was assigned the Halliburton account while in her Regional Sales Director role under Rossana Martin and was permitted to remain the lead salesperson after her promotion to Vice President. ECF No. 69 ¶ 14.

The other Vice Presidents in Global Sales were located around the world. ECF No. 69 ¶ 15. Andy Menkes, Senior Vice President, Global Client Solutions, was assigned to the sales teams for prospective clients UPS and Becton Dickinson. ECF No. 69 ¶ 16. Menkes is a

consultant in the travel industry. BCD hired him as an employee of BCD with an employment contract for approximately two years from 2018 to 2020 to help BCD support its sales teams and to utilize Menkes's relationships in the industry to assist BCD in winning bids. ECF No. 69 ¶ 17. Menkes did not have the same position as Blough, had no sales quota, earned no commissions, and reported directly to Michael Janssen, Chief Commercial Officer. ECF No. 69 ¶ 18. Menkes assisted with the bid for UPS's business during his employment with BCD, and the bid was closed as lost in August 2019. ECF No. 69 ¶ 19. Menkes knew the UPS travel manager. ECF No. 69 ¶ 20. Menkes also assisted with the bid for Becton Dickinson's business during his employment with BCD, and the bid was closed as lost in May 2020. ECF No. 69 ¶ 21. Menkes knew the travel manager at Becton Dickinson. ECF No. 69 ¶ 22. During the time he was employed, Menkes's assigned role with the sales teams was as a senior internal consultant. He was not the assigned salesperson responsible for either the UPS bid or the Becton Dickinson bid; Blough remained the global sales lead for the opportunity on the UPS and Becton Dickinson bids. Blough was eligible to earn commissions if BCD was successful in its bids. ECF No. 69 ¶ 23. Menkes was not eligible to earn commissions if BCD was successful in its bids. ECF No. 69 ¶ 24. Menkes also assisted other sales leads, including Rossana Martin and Deb Cruz, with their prospecting efforts. ECF No. 69 ¶ 25.

Similarly, Kessie Bratko, Senior Vice President, Global Client Team, was assigned to the sales team for Johnson & Johnson as support for Blough in November 2019, an account that was assigned to Blough in May 2019. ECF No. 69 ¶ 26. Bratko was considered a subject matter expert in the travel needs of large pharmaceutical companies who was leading BCD's largest pharmaceutical accounts when she joined the Johnson & Johnson team. ECF No. 69 ¶ 27. Because of her knowledge and experience, Bratko was added to the Johnson & Johnson pitch

6

team to be part of the team to present to the prospect and to formulate strategy to help BCD differentiate from other travel management companies in the travel industry. ECF No. 69 ¶ 28. Bratko was not the assigned sales lead on the Johnson & Johnson account, and she was already servicing a portion of the Johnson & Johnson account. Due to her pharmaceutical and life sciences expertise generally and experience with Johnson & Johnson, she was added to the sales team for this potential expansion opportunity led by Blough. ECF No. 69 ¶ 29. Blough understood that Bratko was not eligible for incentive compensation in her role. ECF No. 69 ¶ 30. To try to expand the work BCD did with Johnson & Johnson, Blough was the global lead and remained the global lead responsible for facilitating the response to the RFP, the deliverables, and the timeline in which BCD submitted answers to Johnson & Johnson's questions. ECF No. 69 ¶ 3; ECF No. 73 ¶ 52.

In approximately March 2021, Debra Cruz, another Vice President of Global Sales, was transferred from the global sales team to the media and entertainment team. ECF No. 69 ¶ 34. Ms. Cruz's transfer to the media and entertainment team left several accounts unassigned, and these accounts were not immediately assigned to any other employee, as these bids were either not active or were needed to preserve a pipeline of work for any new sales employees hired. ECF No. 69 ¶ 35. Ms. Cruz and Mr. Cruz are married to each other. ECF No. 69 ¶ 36.

Throughout her employment as Vice President, Global Sales beginning in July 2018, Blough and Mr. Cruz had numerous conversations regarding Blough's pipeline.  ECF No. 73 ¶ 53.  In these conversations, Mr. Cruz explained to Blough how accounts and new opportunities are assigned and that there are many factors taken into consideration when assigning accounts, including where the opportunity arose, what vice president would be geographically close to the client, industry experience, and existing relationships, among other things. ECF No. 73 ¶ 54.

Blough, like most salespeople who earn commissions, wanted more prospects in her pipeline. ECF No. 69 ¶ 32; ECF No. 73 ¶ 55. In late 2019, Blough's pipeline was appropriate given her experience, skillset, geography, and industry sector. ECF No. 69 ¶ 33; ECF No. 73 ¶ 56.

### 3. Plaintiff's Commission Plans

Under the terms of the Sales Incentive Plans ("SIPs") that provided Blough with the ability to receive commissions in 2020 and 2021, (1) "[d]uring the first six months of ticketing, commissions will not be paid until there is a fully executed customer contract." ECF No. 69 ¶ 37; (2) a salesperson "must be an employee of BCD Travel on the date that commissions are paid to be eligible to receive that commission. All unpaid sales commissions, bonuses and incentives are forfeited upon termination of employment for any reason." ECF No. 69 ¶ 38; and (3) the SIPs could be "amended, modified, or terminated at any time by BCD Travel without prior notice." ECF No. 69 ¶ 39.

### 4. BCD's Company-Wide Suspension of Sales Commission Earnings

During the COVID-19 pandemic, travel was restricted in areas across the globe and as a result, BCD's income precipitously declined, as BCD generates much of its revenue based on travel transactions completed by its clients. ECF No. 73 ¶ 70. Since the commissions for its global salespeople are largely based upon the travel transactions its clients make during the first 15 months of an engagement, with the severe drop-off in corporate travel BCD's salespeople would not be earning much, if any commissions on corporate travel. As a result, both due to in the lost income to the company and the loss of commissions for its salespeople, BCD made the decision to suspend the commission earning window for Q2 through Q4 of 2020. This essentially shifted the period of time in which commissions could be earned to the end of the otherwise applicable period, so that employees would be able to earn more commissions as travel resumed.

ECF No. 69 ¶ 40. This deferred earnings window allowed sales team members to benefit from returning transactions at a later date. ECF No. 69 ¶ 41. The deferral of commissions for these quarters was applied to all individual contributors who earned commissions at BCD, and was not restricted to Blough. ECF No. 69 ¶ 42. Blough agreed to the deferment of commissions under this program. ECF No. 69 ¶ 43. The suspension of the earning of commissions remained in effect though the time when Blough resigned and left BCD. ECF No. 69 ¶ 44. Blough expected to start receiving commissions on the sale of Halliburton in May of 2020, but the deferral program went into effect in March of 2020 and was not lifted prior to her resignation from BCD. ECF No. 73 ¶ 78. The signing of the contract for the Boston Scientific was not executed during Blough's employment, as it was executed on April 25, 2022. ECF No. 73 ¶ 79.

### 5. Alleged Discriminatory Conduct and Complaint During Employment

In February 2019, Blough approached a colleague, Kathy Jackson, former Executive Vice President, Global Program Management, at a BCD event and expressed some concerns about the way she was being treated in her role.  ECF No. 73 ¶ 80.  Specifically, Blough told Jackson that she felt that she was not being respected in the Vice President, Global Sales role and that she had addressed concerns about the sufficiency of her pipeline with Mr. Cruz multiple times, but Mr. Cruz was not responsive or receptive to those concerns.  ECF No. 73 ¶ 81.  On or around February 28, 2019, during that same conference, Jackson informed Yvette Bryant, Senior Vice President, Human Resources, that Blough had some work concerns but was reluctant to bring them forward.  ECF No. 73 ¶ 82.  Bryant told Jackson that it would be best for Blough to reach out to her directly to discuss, but also offered that if Blough preferred, Bryant could initiate the call because Bryant did not want to leave her concerns unaddressed.  ECF No. 73 ¶ 83. On March 5, 2019, since Bryant had not heard from Blough, Bryant sent her an email asking if

Blough would like to connect about her concerns.   ECF No. 73 ¶ 84.  Following this, Bryant had a telephone conversation with Blough in which Blough stated her concerns about her level of support and opportunities in the sales team and interactions with her supervisor, Mr. Cruz. During the conversation, Blough said she was hesitant to raise the issue to Human Resources and get Human Resources involved because she feared it would make things awkward or escalate unnecessarily.  ECF No. 73 ¶ 85. On this call, Blough stated her preference was first to speak with Mr. Cruz and address her concerns directly with him. Blough and Bryant agreed that she would do so, but would keep Bryant updated on how things went.  ECF No. 73 ¶ 86. Blough did not raise any claims about a hostile work environment or sex discrimination in her conversation with Bryant. ECF No. 73 ¶ 87. According to Blough, she feared that she was being set up to get fired, she did not want to lose her job as she had two children in college, and so she opted to speak to Mr. Cruz on her own.  ECF No. 75 ¶ 13.

On March 14, 2019, having received no follow-up from Blough after their phone conversation, Ms. Bryant sent her an email requesting an update and also asking her if she had changed her mind and wanted Human Resources to get involved more directly. ECF No. 73 ¶ 88. On the same day, Blough replied that the prior week's call with Mr. Cruz had been canceled and the current week's call had also been canceled due to a death in Mr. Cruz's family, so she had not yet had an opportunity to discuss with Mr. Cruz, but she still planned to do so.  ECF No. 73 ¶ 89. On April 10, 2019, Bryant sent Blough another follow-up email, asking Blough again for an update or if she needed assistance addressing the concerns with Mr. Cruz.  ECF No. 73 ¶ 90.  In response, Blough emailed Bryant, stating:

> Hi Yvette. Yes, I am so sorry. We did talk last week and everything is good [,]
> and he heard my concerns. We had a good talk and he was out of the country for

> many months after I accepted this position things seem to be at a normal now with
> no further concerns or issues.
> We are all good. 😊

ECF No. 73 ¶ 91. Blough raised no concerns about alleged sex discrimination, a hostile work environment claim, or that she believed she was being paid less than male colleagues in her discussions with Bryant. ECF No. 73 ¶ 92.  Blough did not raise any other concerns with Bryant about her employment with BCD.  ECF No. 73 ¶ 93.

In addition to this interaction with Mr. Cruz, Blough alleges that was demeaned by Bratko in emails and chats between her and other BCD employees and that this was an effort to force her out of BCD. ECF No. 76 at 5.

On the same day that Blough filed her Brief in Opposition to the Motion for Summary Judgment, she requested leave to file the documents relating to the emails and chats under seal. ECF No. 77. Defendant had designated these emails and chats as "Confidential" pursuant to the Stipulated Protective Order issued in this matter. ECF No. 53. BCD did not oppose the filing of the confidential documents under seal, filed a Response to the Motion to Seal, ECF No. 79, and provided the confidential documents to the Court for *in camera* review. ECF No. 79 at 2, n. 1. Plaintiff was granted leave to file the documents under seal. ECF No. 89. Importantly, for purposes of deciding BCD's summary judgment motion, Plaintiff did not seek leave to file an amended Response in Opposition to the Motion for Summary Judgment with record citations to the sealed documents, or seek leave to file a sur-reply, which is permitted by the Court's Summary Judgment Scheduling Order.  ECF No. 68. Regardless, the Court has reviewed the

documents and finds they do not alter the outcome here, even if we were required to do Blough's attorneys' work.[3]

In late 2019, Blough attended a dinner with co-workers Lesley O'Bryan, Thad Slaton, and Andy Menkes. When the discussion turned to opportunities to talk at events sponsored by BCD, Blough remembers asking how she could get on the speaker list and Mr. Cruz responded by asking her, "Do you even know how to speak in front of people?" ECF No. 75 ¶ 20. This was demeaning to Blough. ECF No. 75 ¶ 21.

### 6.    Plaintiff's Resignation

On October 14, 2021, Blough resigned over the phone with Mr. Cruz. ECF No. 69 ¶ 45. In that phone conversation, Blough stated that she was leaving because she had been "trying to get him to right-set [her] pipeline for years; that [she didn't] feel like she was respected, that [she] was valued; and that … [she] was embarrassed by the way he treated [her] and the way he handled the opportunities." ECF No. 69 ¶ 46; ECF No. 73 ¶ 95. She further stated that she "had gone through stress and anxiety and … was at the point where [she] just couldn't do it anymore." ECF No. 69 ¶ 47; ECF No. 73 ¶ 96.   Blough followed her verbal resignation with an email alleging that she was forced to resign due to unbearable conditions that were causing her extreme stress, that she had an inadequate pipeline, lacked a sufficient level of authority and responsibility to run sales efforts as compared to her peers or even regional sales team members,

---

[3]    The United States Court of Appeals for the Third Circuit has observed that, "'Judges are not like pigs, hunting for truffles buried in' the record." Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006), as amended (May 5, 2006) (quoting Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys., 309 F.3d 433, 436 (7th Cir. 2002) and quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

and that assignments were not made to her as promised or in a fair manner, making her feel embarrassed and allegedly forcing her to resign. ECF No. 73 ¶ 97.

Upon receiving Blough's resignation email, Mr. Cruz notified the Human Resources Department. Ursula Dvorkin, Senior Human Resource Business Partner, opened an investigation into Blough's claims. ECF No. 73 ¶ 98. On October 15, 2021, Dvorkin interviewed Blough. During this conversation, Blough once again focused on the inadequacy of her pipeline. ECF No. 73 ¶ 99. At no point did Blough allege that her lack of a pipeline was because Mr. Cruz was favoring her male colleagues or his wife or that she was otherwise subjected to discrimination based on her gender or subjected to a hostile work environment. ECF No. 73 ¶ 100. She did not claim BCD was paying her less than her peers based on her gender or that there were commissions that she was owed and did not receive. ECF No. 73 ¶ 101. Rather, Blough reported to Dvorkin that she felt that from the time she started in the global sales position her accounts were not strategic, had low impact and that she had low commission opportunities. ECF No. 73 ¶ 102. She also reported that she was embarrassed on several calls where someone other than her, usually an individual in a regional role, was leading the calls and not her, which affected her self-esteem. ECF No. 73 ¶ 103.

Blough gave several examples of how she felt her pipeline was lacking. Specifically, she claimed that none of O'Brien's accounts were assigned to her after his termination in 2021, that Ms. Cruz maintained some of her non-entertainment accounts after she moved into the media and entertainment role, and that Blough felt that some of these accounts could have been transferred to her. ECF No. 73 ¶ 104. At no point did Blough tell Dvorkin that she believed she did not receive more or better opportunities due to her gender. ECF No. 73 ¶ 105. Instead, Blough simply complained that when O'Brien left BCD and Ms. Cruz transferred out of the

13

global sales team earlier that year, none of their accounts were reassigned to her. ECF No. 73 ¶ 106.

When Dvorkin asked Mr. Cruz about how he reassigned O'Brien's accounts, Mr. Cruz explained that they were reassigned largely based on geographic proximity to the client and the decisionmaker. ECF No. 73 ¶ 107. O'Brien was a Vice President of Global Sales in the United Kingdom. Many of his accounts were reassigned to other global sales leaders who were in close proximity to the decisionmakers of the clients or prospects. ECF No. 73 ¶ 108. Based on the information Blough and Mr. Cruz provided, Dvorkin did not conclude that Blough was treated unfairly. ECF No. 73 ¶ 109.

Blough was the global sales lead for Boston Scientific. The contract was in the process of being signed when Blough resigned from BCD. ECF No. 69 ¶ 48; ECF No. 73 ¶ 110. The Boston Scientific contract was executed on April 25, 2022, after Blough's termination from BCD. ECF No. 73 ¶ 111.

Blough filed a charge of discrimination with the EEOC on June 13, 2022, alleging, *inter alia*, that she was discriminated against based on her sex, was discriminated against in violation of the Equal Pay Act, and that she was subjected to a hostile work environment. ECF No. 69 ¶ 49; ECF No. 73 ¶ 112.

## C. PROCEDURAL HISTORY

### 1. Pleadings/Legal Claims

Blough filed her original Complaint on June 21, 2023 in the United States District Court for the Middle District of Pennsylvania. ECF No. 1. Defendant moved to dismiss for lack of jurisdiction, or, in the alternative, to transfer, and Blough subsequently stipulated to transfer the case to this District. ECF No. 10. Blough filed an Amended Complaint on December 5, 2023.

ECF No. 15.  Defendant filed an Answer and Counterclaim.  ECF No. 18.  Blough filed an Answer to the Counterclaim.  ECF No. 23.

In the operative Amended Complaint, Blough asserts four claims: (1) at Count I, gender discrimination in violation of Title VII; (2) at Count II, hostile work environment in violation of Title VII; (3) at Count III, breach of contract under Georgia law; and (4) at Count IV, violations of the Equal Pay Act. BCD alleges in its Counterclaim that Blough breached her fiduciary duty to it by virtue of Blough's disclosing confidential and proprietary business information (Count I) and breach of those confidentiality agreements, (Count II).  ECF No. 18 ¶¶ 34-43 and ¶¶ 44-51, respectively.

### 1.  Fact Discovery

The Court entered a Case Management Order, with fact discovery scheduled to conclude by July 24, 2024.  ECF No. 29.  At the parties' request, the Court extended the fact discovery deadline until September 16, 2024, and again until October 11, 2024.  ECF Nos. 40 and 43.  Fact discovery was completed.

### 2.  Motion for Summary Judgment[4]

After discovery closed, the parties filed a Joint Concise Statement of Material Facts. ECF No. 69.  They also filed an Appendix, ECF No. 70, which includes deposition excerpts and declarations.  ECF Nos. 70-1 through 70-7.  BCD then filed the instant Motion for Summary Judgment, Brief in Support, and Concise Statement of Material Facts, ECF Nos. 71, 72, and 73.

---

[4]    Plaintiff did not file a motion for summary judgment as to BCD's counterclaims, despite having indicated her intent to do so.  ECF No. 66. Hence, the Court has not included the parties' Joint Concise Statement of Material Facts relative to those claims.  See ECF No. 69 ¶¶ 50-69.

Blough filed a Brief in Opposition to the Motion for Summary Judgment, a Response to Defendant's Concise Statement of Material Facts, and a Concise Statement of Material Facts. ECF Nos. 74, 75, and 76. As noted supra, Plaintiff also requested leave to file documents under seal, unopposed by BCD, and Court granted the motion with instructions that the documents be served on BCD. ECF Nos. 77, 79, and 80.

BCD filed a Reply Brief in Support of its Motion for Summary Judgment, a Reply to Plaintiff's Responses to Defendant's Concise Statement of Material Facts, and a Response to Plaintiff's Concise Statement of Facts. ECF Nos. 81, 82, and 83.

The Motion for Summary Judgment is ripe for consideration.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the Court that there is an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 322; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

"Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings." Williams v. Pennsylvania Hum. Rels. Comm'n, No. CV 14-1290, 2016 WL 6834612, at *9 (W.D. Pa. Nov. 21, 2016), aff'd, 870 F.3d 294 (3d Cir. 2017) (internal citations omitted). The non-moving party must rely on affidavits, depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine issue. Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 773 (3d Cir. 2013) (citing Celotex, 477 U.S. at 324).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party and must draw all reasonable inferences, and resolve all doubts in favor of the non-moving party. Matreale v. New Jersey Dep't of Mil. & Veterans Affs., 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

### III.    DISCUSSION

With this legal standard in mind, and considering the record evidence and briefing of the parties, the Court now addresses whether BCD is entitled to summary judgment as to each of Blough's claims. The Court concludes it is.

#### A.  Count I:  Gender Discrimination under Title VII

At Count I, Blough alleges BCD discriminated against her based on her gender. Title VII discrimination claims are analyzed through the McDonnell Douglas burden shifting standard under which Blough must first establish a prima facie case of discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999). If the plaintiff meets her initial burden to establish a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. Id. If the employer satisfies this second step, the burden returns to the plaintiff to show "by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Id.

#### 1.  Prima Facie Case

To establish a prima facie case of Title VII discrimination, Blough must generally demonstrate that "(1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered from some form of adverse employment action; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination." Kimes v. Univ. of Scranton, 126 F. Supp. 3d 477, 494 (M.D. Pa. 2015) (citing Jones, 198 F.3d at 410-11).

BCD concedes that Blough is a member of a protected class and that she was qualified for the position she held.  ECF No. 72 at 3. Therefore, the Court's analysis will focus on whether Blough has demonstrated the remaining elements of a prima facie case, i.e., that she suffered

some form of adverse employment action under circumstances that give rise to an inference of unlawful discrimination. Jones, 198 F.3d at 410-11.

Blough contends that she suffered adverse employment action when BCD did not assign her accounts and business prospects, and that the manner in which the accounts were assigned gives rise to an inference of discrimination. This analysis centers around whether the employer treats "some people less favorably than others because of their race, color, religion, sex, or national origin." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). A plaintiff must also show some "causal nexus between [her] membership in a protected class and the [adverse] decision." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 789 (3d Cir. 2003). Therefore, to show sex discrimination under Title VII, a plaintiff must show that her gender was a "determinative factor" in the adverse employment action. Kimes, 126 F. Supp. 3d at 494 (citing Watson v. Se. Pennsylvania Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000)). An inference of unlawful discrimination can arise when a similarly situated colleague outside of the plaintiff's protected class receives more favorable treatment from an employer. Peake v. Pennsylvania State Police, 644 F. App'x 148, 151 (3d Cir. 2016) (nonprecedential); McCormick v. Allegheny Valley Sch., No. CIV A. 06-3332, 2008 WL 355617, at *10-*12 (E.D. Pa. Feb. 6, 2008); see also Qin v. Vertex, Inc., 100 F.4th 458, 474 (3d Cir. 2024). Employees are similarly situated when they have similar responsibilities and are held to similar standards. Oakley v. Orthopaedic Assocs. of Allentown, Ltd., 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010).

In its Brief in Support of Motion for Summary Judgment, BCD lists the specific incidents of discriminatory conduct at issue in this case.

> - Mr. Cruz allegedly did not assign Blough a sufficient number of quality accounts
> and prospects when he hired as a Vice President, Global Sales in 2018, and he did not

respond to her requests for better accounts and prospects when two of her new colleagues gave her ten of their prospects that fall.

- BCD did not reassign Ms. Cruz's accounts to Blough when Ms. Cruz was transferred from the global sales team to the media and entertainment team in March 2021.

- BCD did not assign her any the accounts of O'Brien, a Vice President, Global Sales who worked in the United Kingdom, when he left BCD in May 2021. Following O'Brien's departure from BCD, BCD instead assigned several of his substantial prospective accounts to Sekhri, Ms. Cruz, Ton Maanicus, Nick Dewey, and Ralph Winkler, and not to Blough.

- BCD assigned Menkes, a travel consultant hired as a short-term employee of BCD, to the sales teams for two of Blough's prospective client accounts – UPS and Becton Dickinson. Menkes's employment with BCD ended in 2020, and the UPS bid was closed as lost in August 2019, while the Becton Dickinson bid was closed as lost in May 2020.

- BCD assigned Bratko, a female BCD employee who was not in sales, to the sales teams for two of Blough's prospective clients – Johnson & Johnson and Eli Lilly. Bratko was assigned to work on these sales teams in approximately November 2019.

- Mr. Cruz asked Blough if she could "speak in front of a crowd," in front of other BCD colleagues at a meeting on December 3, 2019.

ECF No. 72 at 5.

BCD argues that each of these alleged adverse actions falls outside the 300-day statute of limitations, i.e., before August 17, 2021, and accordingly, her Title VII gender discrimination claim is time-barred. BCD also takes issue with how, rather than consistently relying on record evidence as required by the rules, Blough often cites to her Amended Complaint, see ECF No. 76 at 4-5. The Court finds Blough's reliance on her own pleadings improper when deciding a motion for summary judgment under these circumstances, particularly as she is represented by counsel and her complaint is not verified. See Reese v. Sparks, 760 F.2d 64, 67 n. 3 (3d Cir.

1985) (a verified *pro se* complaint may be treated as an affidavit for purposes of determining a defendant's summary judgment motion.)[5]

In response to BCD's arguments and summary of allegedly discriminatory acts, Blough provides a nearly parallel summary, but frames them more broadly.  She avers that the adverse employment actions were part of "an ongoing practice of discrimination starting from the initial assignment of her accounts through her complaints about the insufficiency of her pipeline as compared to male employees and Ms. Cruz through her constructive discharge."  ECF No. 76 at 43.  In support of this argument, she specifically refers to the fact that she complained to Mr. Cruz about the assignment of the Becton Dickinson and UPS accounts to Menkes and the purported interference with her efforts to procure the Johnson & Johnson account by assigning it to Ms. Bratko, who had no sales experience. ECF No. 76 at 8-9.  According to Blough, these incidents give rise to an inference of discrimination and, therefore, BCD's motion for summary judgment should be denied.

The problem that Blough faces is she waited too long to pursue this claim.  Before filing suit under Title VII, a plaintiff must exhaust administrative remedies by filing a timely charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e). A claimant in a deferral state such as Pennsylvania must first file the EEOC charge within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1).  Here, Blough filed her charge of discrimination against BCD with the EEOC on June 13, 2022, ECF No. 69 ¶ 49, and the Court

---

[5]     BCD also objects to Blough's counterstatement of facts on the grounds she cites to an order dated November 21, 2023 found at ECF No. 14. ECF No. 83, *passim*.  The Court presumes Plaintiff's citations to ECF No. 14 are typographical errors and that Plaintiff intended to cite to the Amended Complaint at ECF No. 15.  In any event, those citations, even if corrected, are disregarded as legally improper.

takes judicial notice that 300 days prior to that date is August 17, 2021. Walton v. Westmoreland Cnty., No. CV 21-860, 2024 WL 36971, at *10 (W.D. Pa. Jan. 3, 2024) (taking judicial notice for similar purpose). As the Supreme Court has explained, each discrete discriminatory act constitutes a separate actionable unlawful employment practice. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Discrete acts include "termination, failure to promote, denial or transfer, or refusal to hire." Id. However, "discrete discriminatory acts are not actionable if time barred, even though they are related to the acts alleged in timely filed charges." Id. at 113.

The continuing violation doctrine upon which Blough attempts to rely provides a limited exception which may apply if discriminatory acts which are not individually actionable are linked into a pattern of actions that extend into the applicable 300-day lookback period. Mandel v. M&Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (quoting O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006)). In other words, "[t]o allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." Id. at 165-66 (citations omitted) (emphasis added). Based on the uncontroverted facts in the record, the assignment of accounts to her, which were purportedly less desirable or promising than those assigned to male employees who may have held lower positions than she held, all took place prior to August 17, 2021. The initial assignment of accounts upon hiring her as Vice President of Global Sales by Cruz occurred in 2018, the ten new assignments occurred in the fall of 2018, Ms. Cruz left global sales in March of 2021, O'Brien left in May of 2021, Menkes left BCD in 2020, the UPS bid was closed as lost in August of 2019, the Becton Dickinson bid was closed as lost in May 2020, and Bratko (a female) was assigned to Johnson & Johnson and Eli Lilly in

November 2019. Finally, Mr. Cruz's remark about Blough's speaking ability occurred in December of 2019.

Accordingly, BCD's motion for summary judgment is granted with respect to Blough's gender discrimination claim at Count I on the basis of untimeliness.

### 2.  Legitimate, Non-Discriminatory Reason

Even if Blough is presumed to have met her initial burden of establishing a prima facie case of gender discrimination, out of an abundance of caution, the Court continues with the well-known McDonnell Douglas analysis, and notes that the burden would then shift to BCD to offer a legitimate, non-discriminatory reason for the adverse employment action. Jones, 198 F.3d at 412. "[T]he defendant's burden at this stage is relatively light and . . . it is satisfied if the defendant articulates a legitimate reason for the adverse employment action." Johnson v. Keebler-Sunshine Biscuits, Inc., 214 F. App'x 239, 242 (3d Cir. 2007) (examining Woodson v. Scott Paper Co., 109 F.3d 913, 920 n. 2 (3d Cir. 1997)). Here, BCD has done so. It has proffered the following undisputed facts in support of its claim that it has met its burden as to a legitimate, nondiscriminatory reason for any adverse employment action. BCD's practice of assigning current or prospective client accounts to its global sales teams takes into consideration multiple factors. ECF No. 73 ¶ 8. Prospective accounts or opportunities are assigned to employees or sales teams based on several different factors, including but not limited to: an employee/sales team's geographic proximity to a client's principal location and the location of the decisionmaker; the timing of a request for proposal for the prospective client; the salesperson's experience with and knowledge of the client or prospect and its industry; previously established client relationships; and the salesperson's overall sales seniority and experience, current workload and bid activity, and work history, with no single factor being dispositive. ECF No. 73 ¶ 9. Additionally, when a

salesperson leaves the Company, a portion of that salesperson's pipeline generally remains unassigned to ensure that there will be prospects for the salesperson who is hired to fill that position, though accounts with imminent bids or active bids in progress typically would be reassigned to an existing salesperson. ECF No. 73 ¶ 10. The Court notes that while Blough summarily objects to these facts, which BCD has supported with record citations, Blough herself has not provided any record citations in support of her objections.  ECF No. 74 ¶¶ 8-10.

In light of BCD's uncontroverted evidence, the Court finds that BCD has satisfied its burden by articulating a legitimate, nondiscriminatory reason for the alleged adverse employment action as far as the manner in which it assigns accounts.

### 3. Pretext

Presuming for the sake of argument that Blough has shown a prima facie case of gender discrimination within the applicable time period, and having determined that BCD has proffered a legitimate reason for the adverse employment actions, the burden returns to Blough to show by a preponderance of the evidence that Defendant's proffered non-discriminatory reason is pretextual. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 654 (3d Cir. 2015) (citing Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013)). A plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted); see also Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Based on the scant record evidence Blough has presented, with no citation to the record in her Response Brief, ECF No. 76 at 12-13, the Court concludes that Blough has neither

discredited BCD's proffered reasons for making its decisions to assign accounts to other employees was pretext, nor has she demonstrated that that gender discrimination was more likely than not a motivating cause in the assignment of accounts.  Fuentes, 32 F.3d at 762, 765.

For all of these reasons, the Court grants BCD's motion for summary judgment as to Count I – Title VII gender discrimination.

### B. Count II: Hostile Work Environment Under Title VII

Next, the Court considers Blough's hostile work environment claim under Title VII, which fares no better for numerous reasons.  Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." Mandel, 706 F.3d at 167 (citing Meritor Sav. Bank, FSB v. Vinson, 447 U.S. 57, 67 (1986)).  To establish a prima facie case of hostile work environment under Title VII, Blough must show, "(1) [she] suffered intentional discrimination [in a work environment] because of [her] sex; (2) this discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990)). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." Mandel, 706 F.3d at 167. To determine whether a work environment is hostile, courts look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; an whether it unreasonably interferes with an employee's work performance." Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 215 (3d Cir. 2017) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)); see also

25

Drinkwater v. Union Carbide Corp., 904 F.2d 853, 863 (3d Cir. 1990) ("Hostile work environment harassment claims must demonstrate a continuous period of harassment."). Title VII protects against harassment based on discrimination against a protected class only and does not extend relief for general workplace harassment or strained supervisor-employer relationships. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998); Ismail v. McDermott Int'l Inc., No. 3:19-CV-1305, 2024 WL 1094685, at *5-*6 (M.D. Pa. 2024).

To establish a hostile work environment claim, Blough must show "that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Peace-Wickham v. Walls, 409 F. App'x 512, 519 (3d Cir. 2010) (Morgan, 536 U.S. at 116). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotations and citations omitted).

Here, although Blough made complaints regarding Mr. Cruz to two separate Human Resources professionals at BCD, it is notable that neither was able to substantiate any inappropriate conduct. ECF No. 73 ¶¶ 92, 109. BCD argues that, assuming for the purposes of its motion that Blough can establish the third and fifth prongs of the test, her harassment claim fails because she cannot prove that she suffered intentional harassment because of her sex, that the alleged harassment was severe or pervasive, or that the alleged harassment would detrimentally affect a reasonable person in similar circumstances. ECF No. 72 at 13-14. Plaintiff bases her hostile work environment claim on the manner in which BCD made account assignments, such as adding Menkes (who left in 2020) and Bratko (who was assigned to work

26

on the Johnson & Johnson and Eli Lilly sales teams in 2019) and the comment made by Mr. Cruz at the work dinner in December 2019 when he embarrassed her by questioning her experience with public speaking when he said, "Do you even know how to speak in front of people?" ECF No. 76 at 5.

Again, timeliness is an issue. "[A] Title VII hostile work environment claim is timely if any of the acts in the pattern that comprises the hostile work environment occurred within the 300-day lookback period." McClain v. Connellsville Sch. Dist., No. 2:20-CV-01485, 2021 WL 1737465, at *2 (W.D. Pa. May 3, 2021); see also O'Connor, 440 F.3d at 127 (quoting Morgan, 536 U.S. at 105) ("[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period."). In this case, none of the purported acts occurred during the relevant time period, i.e., before August 17, 2021.

Even so, as for Mr. Cruz's comment, even if there was evidence to support the inference that his question, as to whether Blough knew how to speak in front of people, was intentional discrimination based on her gender, the caselaw is clear that this does not suffice to establish a genuine dispute of material fact as to a hostile work environment claim. Offensive conduct or conduct that renders the employee's work life unpleasant or uncomfortable is not enough. McClendon v. Dougherty, No. 2:10-CV-1339, 2011 WL 677481 (W.D. Pa. Feb. 15, 2011). Likewise, "[a]llegations properly described as petty slights, minor annoyances, and simple lack of good manners do not suffice to establish an actionable hostile work environment." Yarnall v. Philadelphia School Dist., 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

27

With respect to the remaining hostile work environment theory, rather addressing BCD's arguments or citing to case law or additional record evidence to show that the discriminatory manner in which BCD assigned its accounts over the years rose was so severe and persuasive as to create an abusive working environment, Blough instead argues that BCD's motion should be denied because it is a factual issue for the jury to determine if that conduct detrimentally affected her under the reasonable person standard.  ECF No. 76 at 14-15.  She has provided no evidence that any of the business decisions as to the assignment of sales opportunities and accounts was based on her gender.  And she is wrong that the issue is for the jury; in appropriate cases, courts have often held that a jury trial is not necessary when a defendant has met its burden on summary judgment in hostile work environment cases. See Brauner v. Medscope Am. Corp., No. CV 24-6512, 2026 WL 592380, at *13 (E.D. Pa. Mar. 2, 2026) (granting summary judgment to defendant employer where remarks made in a couple of meetings  dismissing plaintiff's comments as trivial did not create a  hostile work environment); Kendrell v. Mattis, No. CV 17-229, 2018 WL 5785446, at *6 (E.D. Pa. Nov. 5, 2018) (granting summary judgment to defendant despite defendant's employee giving "abrupt, off the cuff project instructions", being "overly critical, sarcastic, or cynical" and telling plaintiff that she "was tired of hearing [plaintiff's] disability as an excuse" because such conduct "does not alone evidence a hostile work environment") (citation modified); Williams v. Pennsylvania Hum. Rels. Comm'n, No. CV 14-1290, 2016 WL 6834612, at *24 (W.D. Pa. Nov. 21, 2016) (granting summary judgment to defendant because "[r]ude behavior and disagreement with [plaintiff], even if [plaintiff] could be characterized as generally agreeable in the workplace, would not meet the requirements to show a hostile work environment"); Dreshman v. Henry Clay Villa, 733 F. Supp. 2d 597, 614 (W.D. Pa. 2010) (granting summary judgment to defendant because "the incidents alleged were largely

verbal comments directed toward Plaintiff and, while the content of the statements were sometimes offensive and their utterances certainly were unprofessional, the mere utterance of an epithet, joke, or inappropriate taunt that may cause offense ... are not sufficiently severe or pervasive to be actionable") (citation modified); Rose v. Woolworth Corp., 137 F.Supp.2d 604, 607-11 (E.D. Pa. 2001) (granting summary judgment to defendant despite defendant's employee subjecting plaintiff to "constant and unremitting negative comments and evaluations" because such conduct did not "constitute a change in terms and conditions of employment") (citation modified). Based on the record before it, the Court concludes that no reasonable jury could find Mr. Cruz's conduct or BCD's method of assignment of accounts was so severe or persuasive so as to constitute intentional harassment because of her sex.

Blough contends that she was constructively discharged, which, if proven, would place the date of the alleged discriminatory act in October of 2021, within the statute of limitations. ECF No. 76 at 5, 13-15. Constructive discharge is a particular type of adverse employment action in which a plaintiff "must show that 'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Reifinger v. Parkland Sch. Dist., 601 F. App'x 138, 142 (3d Cir. 2015) (quoting Gross v. Exxon Off. Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)). This requires "a greater severity of pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n. 4 (3d Cir. 2006). "[S]everal factors . . . may be indicative of constructive discharge: (1) threat of discharge; (2) suggesting or encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations." Lebovsky v. City of Philadelphia, 394 F. App'x 935, 939 (3d

Cir. 2010) (citing Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)). In order to survive summary judgment regarding constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. Williams v. Pennsylvania Hum. Rels. Comm'n, No. CV 14-1290, 2016 WL 6834612, at *25 (W.D. Pa. Nov. 21, 2016), aff'd, 870 F.3d 294 (3d Cir. 2017) (internal citation and quotation omitted).

Having found that there is no genuine dispute of material fact as to the hostile work environment claim, it follows that there is no genuine dispute of material fat as to the more demanding standard required of the constructive discharge claim. Blough has stated she complained of Mr. Cruz's assignments to two separate Human Resources professionals at BCD, and neither was able to substantiate any inappropriate conduct, indicating that the conduct raised to BCD's attention was not sufficient to constitute an objective change to Blough's conditions of employment. ECF No. 73 ¶¶ 92, 109. BCD has shown the methodology for assignment of the sales accounts and that it addressed her concerns with Mr. Cruz by following up with her. In response, Blough has failed to show through record evidence that there is a genuine issue that BCD knowingly permitted the alleged discrimination to be intolerable, that she was ever threatened with a change in her employment, or that her employment conditions were so intolerable that she felt she had to leave. There was no conversation in that regard in the days following her resignation. Viewed from the perspective of a reasonable employee, as the law requires, Blough has not established an objectively intolerable situation that would compel any reasonable employee to resign.  See, e.g., Hopson v. Dollar Bank, 994 F. Supp. 332, 340 (W.D. Pa. 1997) (denial of promotion coupled with racist comment that department was getting "too dark" did not establish constructive discharge); Mayo v. Bangor Area Sch. Dist.,  No. 11-CV-

06026, 2013 WL 3716533, at *12-*13 (E.D. Pa. July 16, 2013) (granting summary judgment on constructive discharge claim where plaintiff school psychologist was told in July that she would be terminated for job performance issues if she did not resign but she did not resign at that time and the termination charge was withdrawn, and in September she resigned complaining that her office was relocated and she had to share work space and no longer had access to school laptop computer).

Taking all inferences in favor of Blough, and for all of the reasons stated herein, there is no genuine dispute of material fact for trial and no reasonable jury could conclude that Blough suffered a hostile work environment during her employment. Therefore, Defendant's motion for summary judgment as to Count II – Title VII hostile work environment– is granted.

### C.    Count III:  Breach of Contract

Blough alleges in her Amended Complaint that BCD breached the SIPs when it failed to pay her the full commission due and owing arising from sales to BCD clients Halliburton and Boston Scientific.   ECF No. 15 ¶¶ 32, 56-57. While Plaintiff's Amended Complaint alleges breach of contract under Georgia law, ECF No. 15 ¶ 56, neither party has briefed the issue of breach of contract under Georgia law. "The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken." Overlook Gardens Props., LLC v. Orix, USA, LP, 884 S.E.2d 433, 440 (Ga. Ct. App. 2023).

BCD argues that summary judgment should be granted because BCD modified the terms of the SIPS, to which Blough admits she agreed, that the modifications were made in order to defer compensation pursuant to the SIPs, and because Blough resigned before the commissions were earned and due to be paid.  ECF No. 72 at 21-22, citing ECF No. 69 ¶¶ 40-44.

31

"The construction of a contract is a question of law for the court." Argo v. G-Tec Servs., LLC, 791 S.E.2d 193, 194-95 (Ga. Ct. App. 2016) (citing Ga. Code Ann. § 13–2–1). The cardinal rule of contract construction is to ascertain the intention of the parties to the contract. Id. (citations omitted). When construing contracts, there are three steps to ascertain the intent of the parties:

> First, the court decides if the contract language is unambiguous, and if so, the court enforces the contract's clear terms. Second, if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity. And third, if the ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury.

Eckerd Corp. v. Alterman Props., Ltd., 589 S.E.2d 660 (Ga. Ct. App. 2003).

Here, the terms of the contracts that govern Blough's sales are unambiguous, and the Court need not go further in its analysis to enforce their clear terms. As articulated in the Joint Statement of Material Facts, the 2020 and 2021 SIPs could be "amended, modified or terminated at any time by BCD Travel without prior notice." ECF No. 69 ¶ 39. During the COVID-19 pandemic, which caused lost income to the company and the loss of commissions for its salespeople, BCD made the decision to suspend the commission earning window for Q2 through Q4 of 2020. This essentially shifted the period of time in which commissions could be earned to the end of the otherwise applicable period, so that employees would be able to earn more commissions as travel resumed. ECF No. 69 ¶ 40. This deferred earnings window allowed sales team members to benefit from returning transactions at a later date. ECF No. 69 ¶ 41.

The deferral of commissions for these quarters was applied to all individual contributors who earned commissions at BCD, and was not restricted to Blough. ECF No. 69 ¶ 42 (emphasis added). Blough agreed to the deferment of commissions under this program. ECF No. 69 ¶ 43. The suspension of the earning of commissions remained in effect though the time when Blough

resigned and left BCD. ECF No. 69 ¶ 44. There is no dispute that the SIPs required that Blough be an employee of BCD "on the date that commissions are paid to be eligible to receive that commission," and further, the SIPs state that "[a]ll unpaid sales commissions, bonuses and incentives are forfeited upon termination of employment for any reason." ECF No. 69 ¶ 38. The deferral of commissions for these quarters was applied to all individual contributors who earned commissions at BCD, and was not restricted to Blough. ECF No. 69 ¶ 42.

BCD notes that as to the Halliburton account, and as Blough admitted during her deposition, her commissions as originally structured were set begin in May of 2020, but the deferral program began in March of 2020. Because the deferral program remained in effect when she resigned, BCD argues, she was not entitled to any commissions arising from the Halliburton sales. BCD further contends it did not fail to pay commissions owed to Blough arising from the Boston Scientific contract because that contract between BCD and Boston Scientific was executed in April 2022, well after Blough left BCD.  ECF No. 72 at 23, citing ECF No. 73 ¶ 79.

In her response brief, Blough does not challenge the validity of the contracts.  Instead, without record citation, she admits she:

> along with other BCD commissioned employees, was bound by this decision. The difference between Ms. Blough and other BCD employees who were entitled to commissions is that Ms. Blough was subjected to discrimination and harassment based on her sex which caused her to be constructively discharged before the opportunities she worked on matured into contracts.

ECF No. 76 at 15. Plaintiff cites to no case precedent or authority for this argument.

The Court finds that there is no genuine dispute of material fact that Blough was not entitled to any commissions under either contract at issue, and therefore, BCD's motion for summary judgment is granted as to the breach of contract claim at Count III.

### D.  Count IV:  Equal Pay Act

Next, the Court addresses BCD's motion for summary judgment as to Count IV, in which Blough alleges a violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), arising from BCD's purportedly paying males more in commissions than it paid to Blough.  ECF No. 15 ¶ 60.

Under the EPA, employers are prohibited from discriminating "between employees on the basis of sex by paying [unequal] wages...to employees of the opposite sex in such establishment for equal work." 29 U.S.C. § 206(d)(1). A two-step burden-shifting framework applies to EPA claims. Steele v. Pelmor Lab'ys Inc., 642 F. App'x 129, 135-36 (3d Cir. 2016). Under this framework, the plaintiff must first establish a prima facie case that she was paid differently than members of the opposite sex for performing equal work. Id. If the plaintiff makes such a showing, the "burden of persuasion then shifts to the employer to demonstrate the applicability of one of the four affirmative defenses." Id. Equal work is work "which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); see also Johnson v. Federal Exp. Corp., 604 F. App'x 183, 187 (3d Cir. 2015). "To determine whether two jobs involve equal work, [courts] must determine whether 'a significant portion of the two jobs is identical.'" Johnson, 604 F. App'x at 187 (citing Brobst v. Columbus Servs. Int'l, 761 F.2d 148, 155-56 (3d Cir. 1985)).

BCD's central argument is that under the EPA and applicable regulations, Blough must show that her pay was lower than that of a male who works in the same establishment she did. ECF No. 72 at 24-25, citing, inter alia, 29 U.S.C. § 206(d)(1) and 29 C.F.R. § 1620.9(a).  It argues that Blough worked as a remote Vice President, Global Sales, and during that time, lived in Western Pennsylvania, and that the two male Vice Presidents of Global Sales she identifies as

comparators lived in New Jersey (Sekhri) and the United Kingdom (O'Brien), which are different establishments under the law.  ECF No. 72 at 25.

The Court need not reach this issue because, in effect, Blough has conceded the point. She has not responded to the argument, and, more importantly, she fails to cite to any record evidence in support of her prima facie case.  Specifically, she has not shown any inequality in pay for the performance of work of substantially equal skill, effort, and responsibility.  She simply states she:

> has alleged discrimination based on gender in this action. Her claims are that males of equal and lesser rank than hers were favored and provided opportunities for better and more robust accounts.  The question of whether BCD paid Ms. Blough less than her male counterparts is one of genuine material fact for the jury to decide.

ECF No. 76 at 16 (emphasis added).

In the absence of evidence of her prima facie case that she received lesser pay than her male counterpart(s) for equal work at comparable job, the motion for summary judgment is granted as to Count IV. See Fredriksen v. Consol Energy Inc., No. 2:18-CV-00379, 2019 WL 2108099, at *4 (W.D. Pa. May 14, 2019) (granting summary judgment in favor of employer on grounds plaintiff failed to present evidence of lesser pay, noting, "[w]ithout proof of unequal payment, a wage discrimination claim under EPA.").

Accordingly, BCD's motion for summary judgment is granted as to the EPA claim at Count IV.

## IV.    CONCLUSION

For these reasons, the Court grants Defendant's Motion for Summary Judgment, ECF No. 71. Accordingly, the following Order is entered:

### ORDER

AND NOW, this 1st day of June, 2026, upon consideration of the Motion for Summary Judgment filed on behalf of Defendant BCD Travel USA, LLC, ECF No. 71, IT IS HEREBY ORDERED THAT said motion is GRANTED;

IT IS FURTHER ORDERED that Judgment in favor of Defendant shall not issue until the Defendant's counterclaims have been adjudicated or otherwise addressed by the Court; and

IT IS FURTHER ORDERED that a video status conference will be scheduled by the Court to discuss the remaining BCD counterclaims.

DATED: June ____, 2026

BY THE COURT,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:    All counsel of record by Notice of Electronic Filing

36